UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

THE PROCTER & GAMBLE COMPANY,      :
                                   :      08 Civ. 01532 (WHP)
            Plaintiff,             :
                                   :
      - against -                  :      Amended Complaint
                                   :
PLAYTEX PRODUCTS, INC.,            :
                                   :
            Defendant.             :
                                   :
———————————————————— x

Plaintiff The Procter & Gamble Company ("P&G"), by its attorneys Kramer

Levin Naftalis & Frankel LLP, for its complaint alleges:

Nature of this Action

1.      This is an action for a declaratory judgment under the Federal Declaratory

Judgment Act, 28 U.S.C. §§ 2201, 2202 and Rule 57 of the Federal Rules of Civil Procedure,

brought for the purpose of determining a substantial and actual controversy between the parties.

As set forth more fully below, plaintiff P&G seeks a declaration that: (i) defendant Playtex

Products, Inc. ("Playtex") is precluded from legally challenging any advertising claim by P&G

that its Tampax Pearl tampons provide superior leakage protection compared to Playtex's Gentle

Glide tampons, on the basis of a decision rendered by this Court holding that such a claim is not

false or misleading; (ii) Playtex is equitably estopped from legally challenging such a claim by

advancing a position based upon a supposed new version of Gentle Glide that is inconsistent

with prior representations made by Playtex and relied upon by P&G; or alternatively (iii) any

advertising claim by P&G that its Tampax Pearl tampons provides superior leakage protection

compared to Gentle Glide is not false or misleading under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), or state statutory or common law.

### The Parties, Jurisdiction and Venue

2.      Plaintiff P&G is an Ohio corporation with its headquarters in Cincinnati, Ohio.

3.      Defendant Playtex is a Delaware corporation with its headquarters in Westport, Connecticut.  Playtex is presently doing business in the State of New York and conducts business in this judicial district.  In September 2007, Energizer Holdings, Inc. ("Energizer") purchased Playtex and Playtex is now a wholly-owned subsidiary of Energizer.

4.      This Court has jurisdiction over the subject matter of this action pursuant to claims arising out of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and pursuant to 28 U.S.C. § 1338(b) for claims arising under the common law of unfair competition.  The Court may render a declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

5.      Venue is properly laid in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

### The Prior Action Between the Parties

6.      P&G and Playtex are two of the principal competitors in the tampon market.  Playtex markets among other products a plastic tampon applicator product called Gentle Glide.  In 2002, P&G introduced a competing plastic tampon applicator product called Tampax Pearl.

7.    In October 2002, Playtex commenced an action against P&G in the United States District Court for the Southern District of New York alleging that P&G's advertising for its Tampax Pearl tampons violated the Lanham Act, 15 U.S.C. § 1125(a) and state unfair competition law.  The prior action, captioned *Playtex Products, Inc. v. The Procter & Gamble Company*, 02 Civ. 8046 (WHP), was assigned to the Honorable William H. Pauley III.

8.    Following a trial, in May 2003 a jury found that P&G's claims that Tampax Pearl was superior to Gentle Glide with respect to leakage protection and comfort violated the Lanham Act.  Thereafter, the Court issued a Judgment and Order of Permanent Injunction, dated May 29, 2003, permanently enjoining P&G from advertising that "(a) Tampax Pearl tampons are superior in wearing comfort or protection to Playtex Gentle Glide tampons; and (b) Tampax Pearl tampons are superior in absorbency to or have an absorbent braid for better protection than Playtex Gentle Glide tampons. . . ." (Exh. A, attached).

9.    The Permanent Injunction provided at paragraph 8, however, that "Nothing in this Judgment and Order shall preclude P&G from making supported claims concerning materially changed versions of the parties' tampon products." (*Id.* at 3).

10.    Beginning in 2004, P&G invested substantial time, money and effort developing a new version of Tampax Pearl, with improved performance.  That effort resulted in the launch of a new Tampax Pearl ("New Pearl") in May 2006.

11.    P&G conducted extensive testing of New Pearl, including comparative testing against Gentle Glide.  The tests showed that not only was New Pearl an improvement over Old Pearl, but also that New Pearl provided superior leakage protection when compared to Gentle Glide.

KL3 2647405.1

12.    Accordingly, on June 8, 2007 P&G moved pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure to vacate or, in the alternative, to clarify the Court's May 2003 Judgment and Order of Permanent Injunction.    Prior thereto, the parties had conducted extensive discovery concerning the issues raised in the motion.    The Court conducted a three-day evidentiary hearing on June 19-21, 2007.    A total of ten witnesses testified, and the parties presented to the Court substantial documentary evidence.    In addition, each side introduced into evidence leakage protection studies comparing the two products at issue.    The parties also submitted extensive pre and post-trial written submissions.

13.    Shortly before filing its motion to vacate or clarify, P&G became aware that Playtex was purportedly developing an altered form of Gentle Glide.    Accordingly, P&G inquired of Playtex as to its position concerning the impact of that supposed new version on the then-upcoming hearing.

14.    In a letter dated June 1, 2007, counsel for Playtex represented to counsel for P&G that "New Gentle Glide is substantially equivalent to the Gentle Glide product that was the subject of the Court's injunction ('Old Gentle Glide').    Accordingly, it is not materially changed."    (Exh. B, attached).    Playtex's counsel went on to state that "if P&G elects to go forward with the hearing as scheduled, it will be Playtex's position that P&G will be precluded from seeking additional relief from the injunction based on New Gentle Glide."

15.    In a footnote in its Pre-Hearing Memorandum, submitted on or about June 8, 2007, Playtex made the following representation to the Court:

At the pre-motion conference, we informed the Court that Playtex itself may be introducing a new Gentle Glide product ("New Gentle Glide"). Playtex has in fact elected to do so and has informed P&G. It is Playtex's position that New Gentle Glide is not a "materially changed" product under the Injunction Order despite being an improved product. Playtex invited P&G to postpone the June 19 hearing if it wished to test New Gentle Glide, but to date P&G has persisted in going forward. Playtex also informed P&G that, if it wished to go forward on New Pearl alone, it would be Playtex's position that P&G is barred from seeking additional relief from the Injunction Order on the grounds that New Gentle Glide is a "materially changed" product. On June 6, 2007 P&G declined Playtex's invitation to postpone the hearing.

16.    Playtex had reason to believe that P&G would rely upon the representations described in paragraphs 14 and 15, above. In fact, in reliance on these representations, P&G did not seek to retest New Pearl against the supposed new version of Gentle Glide for purposes of its motion to vacate or clarify the Permanent Injunction. Also relying on Playtex's representations, P&G determined to proceed with the hearing.

17.    For its part, Playtex did not seek to offer any evidence with respect to the alleged new version of Gentle Glide or in any way to raise any issue that P&G's testing was inadequate because it did not include the alleged new version of the Gentle Glide product.

18.    On February 6, 2008, the Court granted P&G's motion and modified the Permanent Injunction. (Exh. C, attached). After reviewing the significant changes made by P&G to create the new version of Tampax Pearl, the Court also considered the parties' respective leakage protection studies, holding that the P&G study showing Tampax Pearl's superiority over Gentle Glide for leakage protection "was rigorous in its methodology." (*Id.* at 8). By contrast, the Court held that "the Playtex Study was flawed in several respects," including that the study

"failed to simulate normal consumer usage." (*Id.* at 7). Overall, the Court concluded that "the

P&G Study [is] more reliable than the Playtex Study. . . ." (*Id.* at 8).

      19.    The Court thus concluded as follows:

> Given the relative strength of the P&G Study, P&G's *in vitro* and
> *in vivo* tests supporting New Pearl's improved absorbency, and
> expert testimony linking P&G's manufacturing changes to the
> improvements, this Court finds P&G has demonstrated significant
> change in the absorbency of its Tampax Pearl tampons relative to
> Gentle Glide. Moreover, because the information is not false or
> misleading, disseminating it is in the public interest. Accordingly,
> this Court will remove the prohibitions against P&G advertising
> New Pearl's superior absorbency and protection from the
> Injunction Order.[*]

(*Id.* at 9).

## Playtex's Threatened Litigation

      20.    The very day the Court issued its decision, the Vice President & General

Counsel of Playtex's new parent Energizer wrote to P&G's inside counsel, threatening to sue

P&G if P&G aired advertising claims that Tampax Pearl was superior to Gentle Glide with

respect to leakage protection — the very claim the Court had held just hours earlier was not false

or misleading:

> As you may know, Energizer and P&G have an agreement in the
> battery and razor commercial segments to communicate on
> potential disputes before litigation is commenced. That agreement
> does not extend to the Playtex commercial segment. In the spirit
> of that agreement, however, I am writing you to raise an issue in
> advance of any action on Energizer's part.

---

[*]    The Court amended its Order on February 11, 2008 to redact certain trade secret
information.

We have reviewed Judge Pauley's February 6 Memorandum and Order arising from the June, 2007 hearing. As you know, the Playtex product at issue in that hearing was Old Gentle Glide, which is now no longer on the market. I understand that P&G was aware at the time the hearing commenced that Playtex was about to commercialize New Gentle Glide, but nevertheless declined to place New Gentle Glide in issue.

21.    After asserting that the purportedly new version of Gentle Glide "has important performance advantages over Old Gentle Glide" and that Energizer had data purportedly showing no performance difference between Gentle Glide and New Pearl, counsel for Energizer declared:

> This is to put you on notice that any claims by P&G of superior protection or absorbency of New Pearl over New Gentle Glide will, in our view, be false and subject to challenge in court. Should you choose to go forward with such claims, we would caution you to limit the scope of advertising which can readily be removed following any injunction order.

(Exh. D, attached).

### The Actual Controversy

22.    At the time of the hearing, Playtex knew that it had developed what it claimed was a new version of Gentle Glide. In fact, Playtex began selling the supposed new version in the marketplace in June 2007, which is well before the Court issued its decision on February 6, 2008 holding that Tampax Pearl was superior to Gentle Glide with respect to leakage protection. Moreover, it is clear that whatever testing Playtex has performed on this issue was conducted well before the Court's decision. Nevertheless, despite ample opportunity from June 2007 through February 6, 2008, Playtex never submitted to the Court any testing of the supposed new product or raised in any way the contention that P&G's testing was deficient and that its

motion should be denied because a supposedly new version of Gentle Glide was now in the marketplace.

23.    Moreover, Playtex represented to P&G in June 2007, prior to the hearing on P&G's motion to modify the injunction, that the supposed new version of Gentle Glide was "substantially equivalent" to the prior version and "not materially changed." P&G relied on that representation in determining not to test New Pearl against the supposed new Gentle Glide and proceeding with the hearing in June 2007.

24.    Despite these facts, Playtex is now threatening to sue P&G if P&G airs advertising that Tampax Pearl is superior to Gentle Glide for leakage protection — the very claim this Court concluded in its February 6, 2008 ruling was not false or misleading.

25.    By this action, P&G seeks a declaration that Playtex is precluded from relitigating the issue of P&G's superior leakage protection claim. The supposed new facts raised by Playtex in its counsel's February 6, 2008 letter existed well prior to the Court's February 6, 2008 decision, and therefore could have been raised prior to that decision and/or at the June 2007 hearing. Furthermore, these supposed new facts are inconsistent with Playtex's representation to P&G on June 1, 2007 that the purported new version of Gentle Glide "is substantially equivalent to the Gentle Glide product" tested by P&G in the study addressed by the Court in its February 6, 2008 decision. These supposed new facts are inconsistent as well with Playtex's representation to the Court on June 8, 2007 that the purported new version of Gentle Glide is "not a 'materially changed' product."

26.    P&G also seeks a declaration that Playtex is equitably estopped from challenging P&G's superior leakage protection claim by advancing a position that is inconsistent with Playtex's prior representations concerning the purported new version of Gentle Glide. Playtex had reason to believe that P&G would rely upon Playtex's representations to P&G and the Court.  Furthermore, P&G did, in fact, rely upon these representations in determining not to test New Pearl against the supposed new Gentle Glide and proceed with the hearing in June 2007.

27.    In the event the Court finds that Playtex is not barred by res judicata or equitable estoppel, P&G seeks a declaration that any advertising claim it may disseminate that Tampax Pearl is superior to Gentle Glide for leakage protection is not false or misleading under the Lanham Act or applicable state statutory or common law.  P&G believes that it is important to inform consumers of the performance differences between Tampax Pearl with Gentle Glide. The Court itself held that disseminating claims of Tampax Pearl's superior leakage protection "is in the public interest."  (Exh. C at 9).

First Claim for Relief
(Declaratory Judgment — *Res Judicata*)

28.    P&G repeats and realleges the allegations contained in paragraphs 1 through 15, 17 through 22, and 24 through 25 of this amended complaint.

29.    By its actions and threats against P&G, Playtex has demonstrated its intention to try to suppress P&G's truthful advertising claims — claims that the Court held would be in the public interest to disseminate.

30.    In the February 6, 2008 letter from Playtex's parent, Playtex has threatened to take legal action to stop P&G's advertising, including the commencement of another action, perhaps in another forum, in an attempt to avoid the dispositive effect of the Court's February 6, 2008 ruling, and seeking to enjoin P&G's truthful advertising in accordance with this Court's February 6, 2008 decision.

31.    An actual case or controversy exists between P&G and Playtex as to whether Playtex is precluded on account of this Court's February 6, 2008 decision from challenging any advertising claim that Tampax Pearl is superior to Gentle Glide with respect to leakage protection as false or misleading under the Lanham Act and state statutory and common law.

32.    P&G is entitled to a declaratory judgment pursuant to 28 U.S.C § 2201 and Rule 57 of the Federal Rules of Civil Procedure holding that Playtex is precluded on account of this Court's February 6, 2008 decision from challenging any advertising claim that Tampax Pearl is superior to Gentle Glide with respect to leakage protection as false or misleading under the Lanham Act and state statutory and common law, or any other advertising claim addressed by the Court's decision.

33.    No means exist for obtaining the relief requested other than a declaratory judgment of this Court.

Second Claim for Relief
(Declaratory Judgment — Equitable Estoppel)

34.    P&G repeats and realleges the allegations contained in paragraphs 1 through 24, 26, 29 through 30 and 33 of this amended complaint.

35.     An actual case or controversy exists between P&G and Playtex as to whether Playtex is equitably estopped on account of its representations to P&G and P&G detrimental reliance upon those representations from challenging any advertising claim that Tampax Pearl is superior to Gentle Glide with respect to leakage protection as false or misleading under the Lanham Act and state statutory and common law.

36.     P&G is entitled to a declaratory judgment pursuant to 28 U.S.C § 2201 and Rule 57 of the Federal Rules of Civil Procedure holding that Playtex is equitably estopped on account of its representations to P&G and P&G detrimental reliance upon those representations from challenging any advertising claim that Tampax Pearl is superior to Gentle Glide with respect to leakage protection as false or misleading under the Lanham Act and state statutory and common law, or any other advertising claim addressed by the Court's decision.

Third Claim for Relief
(Declaratory Judgment — False Advertising)

37.     P&G repeats and realleges the allegations contained in paragraphs 1 through 24, 27, 29 through 30 and 33 of this amended complaint.

38.     An actual case or controversy exists between P&G and Playtex as to whether any advertising claim by P&G that Tampax Pearl is superior to Gentle Glide with respect to leakage protection is false or misleading under the Lanham Act or state statutory or common law.

KL3 2647405.1

39.    P&G is entitled to a declaratory judgment pursuant to 28 U.S.C § 2201 and Rule 57 of the Federal Rules of Civil Procedure holding that any advertising claim by P&G that Tampax Pearl is superior to Gentle Glide with respect to leakage protection is not false or misleading under the Lanham Act or state statutory or common law.

Wherefore, P&G demands judgment:

(i)    on the first claim for relief, declaring that Playtex is precluded from relitigating the issue of P&G's right to advertise that Tampax Pearl is superior to Gentle Glide with respect to leakage protection, or any other advertising claim addressed by the Court's decision;

(ii)   on the second claim for relief, declaring that Playtex is equitably estopped from challenging P&G's right to advertise that Tampax Pearl is superior to Gentle Glide with respect to leakage protection, or any other advertising claim addressed by the Court's decision;

(iii)  on the third claim for relief, declaring that any advertising claim by P&G that Tampax Pearl is superior to Gentle Glide with respect to leakage protection does not violate the Lanham Act or state statutory or common law; and

KL3 2647405.1

(iv)    on all claims for relief, awarding costs, including attorney's fees, and such

other and further relief as the Court deems just and proper.

Dated:    New York, New York
          March 25, 2008

                                        Kramer Levin Naftalis & Frankel LLP

                                        By:_____
                                                Harold P. Weinberger
                                                Jonathan M. Wagner

                                        Attorneys for Plaintiff
                                        The Procter & Gamble Company
                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone:  (212) 715-9100
                                        hweinberger@kramerlevin.com
                                        jwagner@kramerlevin.com

-13-

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PLAYTEX PRODUCTS, INC.,                  :
a Delaware Corporation,                                    02 Civ. 8046 (WHP)

                                         :
                        Plaintiff,          JUDGMENT AND ORDER
                                            OF PERMANENT INJUNCTION
                                         :
          -against-

                                         :
PROCTER & GAMBLE COMPANY,
an Ohio Corporation,                     :

                        Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WILLIAM H. PAULEY III, District Judge:

   The trial of this action having been held from May 12, 2003 through May 23,

2003, and the jury having rendered its verdict on May 23, 2003 that: (1) the defendant Procter &

Gamble Company ("P&G") violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by

falsely advertising and promoting its Tampax Pearl tampons as superior in comfort, protection

and absorbency to plaintiff Playtex Products, Inc. ("Playtex") Gentle Glide tampons; and (2)

Playtex is entitled to the sum of $2,960,000 to compensate it for lost profits caused by P&G's

Lanham Act violation, it is hereby ORDERED, ADJUDGED AND DECREED that:


1.  P&G, its officers, directors, principals, agents, servants, employees, successors

   and assigns, and all those acting in concert or participation with them are

   permanently enjoined from communicating or stating that (a) Tampax Pearl

   tampons are superior in wearing comfort or protection to Playtex Gentle Glide

   tampons; and (b) Tampax Pearl tampons are superior in absorbency to or have an

   absorbent braid for better protection than Playtex Gentle Glide tampons, either

explicitly or implicitly by reference to "the leading plastic" applicator tampon, and without limitation of reference to the use of comparative words such as "superior," "better," or "more."

2.  P&G shall immediately cease making claims identified in paragraph 1 on its Internet web sites, in public relations statements, through sales force presentations, in product samples, and in any other promotional or advertising materials, including, but not limited to, television advertising, print advertising, point of purchase materials, packaging, direct mail materials, and coupons (the "Materials"), except as set forth in paragraphs 2 and 3.

3.  P&G shall take all commercially reasonable steps to immediately cease making the claims identified in paragraph 1 in magazine advertisements, except nothing in this Judgment shall be construed as requiring P&G to retrieve advertising placed in a magazine issue that has already been printed.

4.  P&G shall take all commercially reasonable steps to immediately cease making the claims identified in paragraph 1 in previously disseminated television advertisements within seven (7) consecutive days from the date of this Judgment and Order.

5.  P&G shall immediately destroy all Materials in its possession, including without limitation, publications, labels, signs, promotional materials, point of purchase materials, coupons, and advertisements containing any of the prohibited claims set forth in paragraph 1.

2

6.    P&G shall immediately notify its distributors, wholesalers, retailers, and any other entity through which P&G's Tampax Pearl products are on sale that pursuant to this Court's Judgment and Order they must immediately cease all further use, sale or distribution of all Materials containing any of the prohibited claims set forth in paragraph 1, and shall immediately return all such Materials to P&G for destruction in compliance with paragraph 5 of this Judgment and Order.

7.    P&G shall, within thirty (30) days of the date of this Judgment and Order, report to the Court in writing, under oath, with a copy to Playtex's counsel, Jeffrey A. Schwab, Esq., setting forth in detail the manner in which P&G has complied with the directives set forth in this Judgment and Order.

8.    Nothing in this Judgment and Order shall preclude P&G from making supported claims concerning materially changed versions of the parties' tampon products.

9.    The Court shall retain jurisdiction over the parties to and subject matter of this action for the purposes of making further orders necessary or proper for the construction or modification of this Judgment and Order, or the enforcement thereof.

10.   Playtex shall submit its request to tax costs, if any, in accordance with Local Rule 54.1.

3

11.    Judgment is hereby entered against P&G in the amount of $2,960,000, plus

accrued post-judgment interest pursuant to 28 U.S.C. § 1961.


Dated:  May 29, 2003
          New York, New York

SO ORDERED:


WILLIAM H. PAULEY III
U.S.D.J.


*Copies mailed to:*

Jeffrey A. Schwab, Esq.
Abelman, Frayne & Schwab
150 East 42nd Street
New York, New York 10017
*Attorneys for Plaintiff*

Matthew B. Lehr, Esq.
Latham & Watkins LLP
135 Commonwealth Drive
Menlo Park, CA 94025
*Attorneys for Plaintiff*

Harold P. Weinberger, Esq.
Kramer, Levin, Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022-3852
*Attorneys for Defendant*


4

Exhibit B

# DAVIS POLK & WARDWELL

1600 EL CAMINO REAL
MENLO PARK, CA 94025
650 752 2000
FAX 650 752 2111

NEW YORK
WASHINGTON, D.C.
LONDON
PARIS
FRANKFURT
MADRID
TOKYO
BEIJING
HONG KONG

MATTHEW B. LEHR
650 752 2010
matthew.lehr@dpw.com

June 1, 2007

Harold P. Weinberger, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036-2714

> Re:   ***Playtex Products v. Procter & Gamble Company***
> ***02 Civ. 8046 (WHP)***

Dear Harold:

This responds to your May 18 e-mail asking for Playtex's position with respect to the modified Gentle Glide product ("New Gentle Glide").

It is Playtex's position that New Gentle Glide is substantially equivalent to the Gentle Glide product that was the subject of the Court's injunction ("Old Gentle Glide"). Accordingly, it is not a materially changed product.

As to the comparative testing between New Pearl and Gentle Glide, it is Playtex's position that a newly fielded test between New Pearl and New Gentle Glide may yield different results from the existing tests between New Pearl and Old Gentle Glide. We are simply not in a position to know *a priori*. Therefore, Playtex will not stipulate that the results will be the same.

We will be sending you non-commercial samples of New Gentle Glide in the next few days, and commercial samples as soon as they become available. We are prepared to postpone the hearing until such time as P&G has the ability to analyze the product and to conduct any testing it deems appropriate. If P&G elects to go forward with the hearing as scheduled, it will be Playtex's position that P&G will be precluded from seeking additional relief from the injunction based on New Gentle Glide.

Sincerely,

Matthew B. Lehr

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLAYTEX PRODUCTS, INC.,                      :
                                             :
                         Plaintiff,          :        02 Civ. 8046 (WHP)
                                             :
          -against-                          :        REDACTED
                                             :        MEMORANDUM AND ORDER
                                             :
PROCTER & GAMBLE COMPANY,                    :
                                             :
                         Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

WILLIAM H. PAULEY III, District Judge:

        Defendant Procter & Gamble Company ("P&G") moves pursuant to Fed. R. Civ.

P. 60(b)(5) to vacate or, in the alternative, to clarify this Court's Judgment and Order of

Permanent Injunction dated May 29, 2003 (the "Injunction Order"). This Court conducted a

three-day evidentiary hearing on P&G's motion. Based on the following findings of fact, this

Court modifies the Injunction Order.[1]

## FINDINGS OF FACT

### I. Background

        Plaintiff Playtex Products, Inc. ("Playtex") markets Gentle Glide tampons, and

P&G sells a competing brand called Tampax Pearl. (Complaint dated Oct. 9, 2002 ("Compl.")

¶¶ 10, 16, 17.) Both brands use plastic applicators and are available in regular, super

absorbency, and super-plus absorbency sizes. (Transcript of Proceedings held from June 19 to

June 21, 2007 ("Tr.") at 167.) P&G also markets a fourth "light" tampon with lower absorbency.

---

[1] Although P&G's motion sought only vacatur or clarification of the Injunction Order,
modification of the Injunction Order is the appropriate relief. This Court "should grant the relief
to which each party is entitled, even if the party has not demanded that relief in its pleadings."
Fed. R. Civ. P. 54(c).

1

(Tr. at 167.) The regular and super absorbency sizes represent eighty to eighty-four percent of

P&G's plastic applicator sales. (Tr. at 166.)

## II. The Injunction Order

Playtex commenced this action, claiming inter alia that P&G had violated the

Lanham Act, 15 U.S.C. § 1125(a), by advertising that P&G's Tampax Pearl ("Tampax Pearl" or

"Old Pearl") provides better leakage protection and comfort than Gentle Glide.

Following a jury verdict in favor of Playtex, this Court issued the Injunction

Order, which provided in relevant part:

> P&G, its officers, directors, principals, agents, servants employees,
> successors and assigns, and all those acting in concert or
> participation with them are permanently enjoined from
> communicating or stating that (a) Tampax Pearl tampons are
> superior in wearing comfort or protection to Playtex Gentle Glide
> tampons; and (b) Tampax Pearl tampons are superior in
> absorbency to or have an absorbent braid for better protection than
> Playtex Gentle Glide tampons, either explicitly or implicitly by
> reference to "the leading plastic" applicator tampon, and without
> limitation of reference to the use of comparative words such as
> "superior," "better," or "more" . . . .

(Injunction Order ¶ 1.)

## III. Development of New Pearl

In 2004, P&G invested approximately $6 million to improve the performance of

Tampax Pearl, culminating in the launch of a new Tampax Pearl in October 2005 ("New Pearl").

(Tr. at 19-21.)

P&G's tampons are made from a fiber web of rayon and cotton, which are

combed for impurities. (Tr. at 17.) Each fiber web is formed to specific dimensions, embossed,

covered in a "nominal overwrap material" and cut into discrete pads. (Tr. at 17-18.) Cords and braids are sewn onto each pad. (Tr. at 17-18.) The pads are compressed into an unstable cylindrical shape using a cross die and push rod, placed into carrier molds, and stabilized through exposure to microwave conditioning. (Tr. at 18.) The stabilized cylindrical pads are passed through an assembly unit that pushes each one into an outer applicator, before being packaged for sale. (Tr. at 18.) When a tampon is inserted into a woman's body, its contact with moisture causes the fibers to expand and absorb fluid. (Tr. at 19.)

For New Pearl, P&G modified its manufacturing process.[2] First, P&G changed the fiber used in the braids, from one with a Y-shaped cross-section to one with a round-shaped cross-section that packs more tightly and allows fluid to seep into the tampon's pad more quickly. (Tr. at 21, 25-26; Exhibit ("Ex.") A: "Pearl Upgrade Changes" presentation at 2.) Second, P&G modified the pads. [Redacted.] [I]t shifted from embossing the entire pad with a fishbone pattern to embossing only the center of the pad; and it reduced the pressure and temperature of the embossing process. (Tr. at 29-33; Ex. A at 4-6.) [Redacted.] Third, P&G increased the mechanical conditioning in New Pearl by compressing it with a longer push rod, resulting in shorter tampon length. (Tr. at 22; Ex. A at 8.) [Redacted.] Finally, P&G further aided the absorption and tampon expansion by increasing the diameter of the inner carrier mold used to make New Pearl. (Tr. at 22, 35-39; Ex. A at 8-10.)

According to expert testimony, although no single change was singularly responsible for improving Tampax Pearl's absorbency, cumulatively these process changes enabled New Pearl to absorb a greater amount of fluid than Old Pearl. (Tr. at 99, 113; Ex. A at

---

[2] Certain modifications in the manufacturing process described in this Court's Memorandum and Order dated February 6, 2008 have been redacted from this paragraph because they constitute trade secret information filed under seal.

1.) Through in vitro testing, which simulates conditions inside the body, P&G confirmed this improvement for its regular, super and super-plus Pearl tampons. (Tr. at 40, 77-78.)

P&G then commissioned two in vivo tests—one for regular and the other for super absorbency tampons—in which participants tried both New Pearl and Old Pearl and reported any leakage. (Tr. at 135-136, 139; Exs. C and D: test requests for regular and super absorbency dated July 12, 2004 and Nov. 11, 2004.) The participants froze the tampons after use and returned them to P&G to verify they were used properly. (Tr. at 135-136.)

P&G analyzed the data from these tests in three ways: first, it compared the average leakage rates of New Pearl and Old Pearl ("Average Percent Leak"); second, it analyzed the amount each returned tampon had absorbed before any leakage occurred ("Average Percent Leak Adjusted for Load"); and third, it determined the average leakage rate, excluding tampons that had absorbed more than their federally mandated capacity prior to leakage (i.e. nine grams for regular and twelve grams for super absorbency) ("Average Percent Leak Below Maximum Design Capacity"). (Tr. at 140-142.) Both regular and super absorbency New Pearl showed improvement over Old Pearl in their leakage protection in all three categories, although the improvement in the Average Percent Leak category was not statistically significant for regular absorbency New Pearl. (Tr. at 144-148; Exs. E and F: Regular and super absorbency test result charts dated Sept. 2004 and July 2005.)


IV. Tests Comparing New Pearl and Gentle Glide

P&G and Playtex each conducted in vivo studies comparing the absorbencies of New Pearl and Gentle Glide (respectively, the "P&G Study" and the "Playtex Study").

A. The P&G Study

4

The P&G Study compared the absorbency of New Pearl and Gentle Glide in regular and super absorbency sizes. (Tr. at 166; Ex. G: Protocol description at 1.) The P&G Study did not try to compare the brands by comfort. (Tr. at 165-166.)

Participants were pre-screened to represent a cross-section of regularly menstruating women aged eighteen to forty-nine. (Tr. at 154-156; Ex. G at 1.) Participants could only qualify for the regular size test group if they typically use regular tampons at least six times per period, while those qualifying for the super absorbency test group had to typically use at least six super tampons per period. (Tr. at 155; Ex. G at 1.) Two hundred eighty and two hundred seventy women completed the regular and super absorbency studies, respectively. (Tr. at 151; Ex. G at 1.) The participants were given ten unmarked test tampons from each brand, of the size that they said they typically use, with the twenty tampons numbered to ensure a random sequence of use. (Tr. at 160-161; Ex. G at 1; Ex. I: Panelist instructions.) The participants were told to use the test tampons whenever their test tampon's size was required, but otherwise to use the number of tampons and the sizes they typically would, given their amount of flow at the time. (Ex. G at 1; Ex. I; Tr. at 155.) The participants froze the test tampons after use and returned them to P&G along with a diary sheet for each tampon recording whether or not leakage occurred. (Tr. at 157, 164.)

P&G again analyzed the data for both the regular and super absorbency tests by comparing Average Percent Leak, Average Percent Leak Adjusted for Load, and Average Percent Leak Below Maximum Design Capacity. (Tr. at 168.) For the regular absorbency size, Average Percent Leak was 20.9% for New Pearl and 24.1% for Gentle Glide, Average Percent Leak Adjusted for Load was 18.5% for New Pearl and 24.0% for Gentle Glide, and Average Percent Leak Below Maximum Design Capacity was 18.1% for New Pearl and 22.9% for Gentle

Glide. (Tr. at 169-170.) For the super absorbency tampons, Average Percent Leak was 22.6% for New Pearl and 25% for Gentle Glide (though this result was not statistically significant), Average Percent Leak Adjusted for Load was 16.5% for New Pearl and 22.3% for Gentle Glide, and Average Percent Leak Below Maximum Design Capacity was 17.6% for New Pearl and 21.7% for Gentle Glide. (Tr. at 171; Ex. G at 2.)

The P&G Study had certain shortcomings. First, it did not compare New Pearl and Gentle Glide in the super-plus absorbency size. (Tr. at 166-167, 177.) Second, the study did not exclude participants who typically use cardboard rather than plastic applicator tampons; for these women, using New Pearl and Gentle Glide would not completely conform to their normal tampon usage. (Tr. at 252-254.) Third, the tests excluded women aged thirteen to seventeen, who represent roughly 15% of the plastic applicator tampon market, because they were considered too young to participate. (Tr. at 266, 395, 406.)

B. The Playtex Study

The Playtex Study compared New Pearl and Gentle Glide in regular, super and super-plus absorbencies. (Tr. at 404-05.) The participants were 737 women aged thirteen to forty-nine from forty different geographical markets in the United States who had used a plastic applicator in the previous three months. (Tr. at 405, 406, 416.) The participants were each given sixteen tampons in sequence, along with one diary sheet for each tampon. (Tr. at 399; Ex. X: Questionnaire instructions dated Nov. 2006 at 6.) The participants were given tampons of the size they typically use, and were given the choice of scented or unscented. (Ex. U at 6.) For each tampon they used, participants had to record on their diary sheets whether leakage occurred. (Tr. at 399.) After they had used at least four tampons, the participants read their results to an

interviewer over the phone.[3] (Tr. at 401-03.) The Playtex Study found that both New Pearl and

Gentle Glide tampons had a twelve percent leakage rate among participants who confirmed they

followed the instructions precisely. (Tr. at 471.)

The Playtex study was flawed in several respects. First, the consultants Playtex

hired to perform the test mistakenly instructed participants "not to use any other tampon products

during the test period." (Tr. at 211-12, 428.) The participants were therefore instructed to

conform their tampon use to the one size, and the sixteen test tampons, that they were given. (Tr.

at 212-13.) However, the participants reported in their pre-screening interviews that they use an

average of seventeen tampons during their periods; moreover, women will often use different

absorbencies, depending on their flow. (Tr. at 212-213.) Thus, the Playtex Study failed to

simulate normal consumer usage. (Tr. at 212-13.) Second, because neither the used tampons nor

the diary sheets were collected, there was no way to review the accuracy of the participants'

responses or the interviewers' reporting. (Tr. at 217-18.) Third, only 217 of the 737 participants

personally confirmed that they had followed the procedures correctly; that number is

significantly fewer than the combined 550 participants who confirmed they completed the P&G

Study's procedures. (Tr. at 461-63; 217-18.)

C. Reliability of the Studies

Despite minor flaws, the P&G Study was rigorous in its methodology. (Tr. at

202-03.) Moreover, trial testimony concerning the changes P&G made to the manufacturing

process provide a plausible explanation for the results of the P&G Study, as do the in vitro and in

---

[3] The interviewers also asked the participants, "Which product, if either, did you prefer for its
protection?" (Tr. at 402.) More participants stated that they preferred Gentle Glide over New
Pearl for protection. (Ex. 35: Computer tabulations of leakage and preference data for Playtex
Study dated Apr. 23, 2007 at 27519, 27520). However, this data is irrelevant to whether New
Pearl provides better protection against leakage than Gentle Glide, and this Court therefore
chooses not to consider this part of the Playtex Study.

vivo tests showing New Pearl's improvement over Old Pearl. (See Ex. A, C-F; Tr. at 77-78, 99,

113.) Although the P&G Study did not compare New Pearl and Gentle Glide in the super-plus

size, because P&G made the demonstrated manufacturing changes in all sizes, this Court infers

that the super-plus size would have tested similarly. The Court finds the P&G Study more

reliable than the Playtex Study because of the faulty instructions given to the participants of the

Playtex Study and greater concerns in the Playtex Study that conditions did not simulate normal

consumer use. See Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 44 (2d Cir. 2000)

("[D]ecisions as to whose testimony to credit and as to which of competing inferences to draw

are entirely within the province of the trier of fact.").


## CONCLUSIONS OF LAW

"[A] court may relieve a party . . . from a final judgment, order, or proceeding . . .

[if] applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "[I]t is

appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction . . .

can show 'a significant change either in factual conditions or in law.'" Agostini v. Felton, 521

U.S. 203, 215 (1997) (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384

(1992)). "When considering the continued equity of injunctive relief, a court should . . .

recognize the need for flexibility." Gismondi, Paglia, Sherling, M.D., P.C. v. Franco, M.D., 206

F. Supp. 2d 597, 599 (S.D.N.Y. 2002). However, the power to vacate or modify an injunction

absent changed circumstances "should be sparingly exercised." King-Seeley Thermos Co. v.

Aladdin Industries, Inc., 418 F.2d 31, 35 (2d Cir. 1969). Moreover, the modification must be

"suitably tailored to the changed circumstance." Rufo, 502 U.S at 393.


8

Modification of an Injunction Order is also appropriate "when [its] enforcement . . . without modification would be detrimental to the public interest." Rufo, 502 U.S at 384-85.[4] The First Amendment protects commercial speech that is not false or misleading, because such expression "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York, 447 U.S. 557, 563 (1980).

Given the relative strength of the P&G Study, P&G's in vitro and in vivo tests supporting New Pearl's improved absorbency, and expert testimony linking P&G's manufacturing changes to the improvements, this Court finds P&G has demonstrated significant change in the absorbency of its Tampax Pearl tampons relative to Gentle Glide. Moreover, because the information is not false or misleading, disseminating it is in the public interest. Accordingly, this Court will remove the prohibitions against P&G advertising New Pearl's superior absorbency and protection from the Injunction Order. This Court has considered Playtex's arguments against lifting these prohibitions without discussing them in detail here.[5]

While P&G has demonstrated that cumulative changes in its manufacturing process led to greater absorbency, it has not specifically shown that New Pearl's braid is the cause of this improvement; in fact, P&G's expert stated that "all of these different changes . . . collectively make the material change in the potential for improved leakage prevention." (Tr. at 113.) Therefore, this Court will continue to enjoin P&G from claiming that "Tampax Pearl tampons . . . have an absorbent braid for better protection." (Injunction Order ¶ 1.)

---

[4] While the Court in Rufo specifically addressed modification of a consent decree, it nevertheless found that a consent decree, while "contractual in nature . . . is subject to the rules generally applicable to other judgments and decrees." Rufo, 502 U.S. at 379.

[5] For example, Playtex suggests replacing the "significant change" standard—the established standard for motions pursuant to Fed. R. Civ. P. 60(b)(5)—with a "material change" standard, and further argues that a change is only "material" if it has been made to a product's design, as opposed to its manufacturing process. (Tr. at 321-22.)

P&G has not demonstrated any changed circumstances with respect to its prior claim that Tampax Pearl is more comfortable than Gentle Glide. This Court will continue to enjoin P&G from making this claim as well.

## CONCLUSION

For the foregoing reasons, this Court modifies the Injunction Order with respect to P&G's claims that its Tampax Pearl provides superior absorbency and protection to Playtex's Gentle Glide. The parties are directed to submit a joint proposed amended injunction order consistent with this Memorandum and Order.

Dated: February 11, 2008
        New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Matthew B. Lehr, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
*Counsel for Plaintiff*

Harold P. Weinberger, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
*Counsel for Defendant*

10

Exhibit D

# *Energizer*

February 6, 2008

Karl S. Steinmanis, Esq.
Procter & Gamble Company
One Procter & Gamble Plaza
Cincinnati, OH 45202

Re: Tampax Pearl

Dear Mr. Steinmanis:

As you may know, Energizer and P&G have an agreement in the battery and razor commercial segments to communicate on potential disputes before litigation is commenced. That agreement does not extend to the Playtex commercial segment. In the spirit of that agreement, however, I am writing you to raise an issue in advance of any action on Energizer's part.

We have reviewed Judge Pauley's February 6 Memorandum and Order arising from the June, 2007 hearing. As you know, the Playtex product at issue in that hearing was Old Gentle Glide, which is now no longer on the market. I understand that P&G was aware at the time the hearing commenced that Playtex was about to commercialize New Gentle Glide, but nevertheless declined to place New Gentle Glide in issue.

Our view is that New Gentle Glide, although not materially different from Old Gentle Glide under the standard Playtex advanced at the hearing, has important performance advantages over Old Gentle Glide. Accordingly, any claims of superior protection or absorbency over New Gentle Glide must be independently substantiated. We in fact have data that shows no protection difference between New Pearl and New Gentle Glide.

This is to put you on notice that any claims by P&G of superior protection or absorbency of New Pearl over New Gentle Glide will, in our view, be false and subject to challenge in court. Should you choose to go forward with such claims, we would caution you to limit the scope to advertising which can readily be removed following any injunction order.

We are prepared to discuss this matter with you at your convenience. My direct dial number is 314/985-2162.

Sincerely,

Gayle G. Stratmann
Vice President & General Counsel
Energizer Holdings, Inc.

cc: Pat Lane, Procter & Gamble Company

Eveready Battery Company, Inc. • *Law Department* • 533 Maryville University Drive • St. Louis, MO 63141

314 985 2223 fax