UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE PROCTER & GAMBLE COMPANY,

                               Plaintiff,

             - against -

PLAYTEX PRODUCTS, INC.,

                         Defendant.

        :  08-cv-1532 (WHP) (THK)
        :
        :  DECLARATION OF
        :  VERONICA C. ABREU IN
        :  SUPPORT OF PLAYTEX'S
        :  OPPOSITION TO P&G'S
        :  MOTION FOR SUMMARY
        :  JUDGMENT AND CROSS-
        :  MOTION FOR SUMMARY
        :  JUDGMENT
        :
        :  Electronically Filed

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

I, Veronica C. Abreu, hereby declare:

1.      I am an associate of the law firm Davis Polk & Wardwell, which represents defendant Playtex Products, Inc. ("Playtex") in the above-captioned matter.  I submit this declaration in support of Playtex's Opposition to P&G's Motion For Summary Judgment and Cross-Motion For Summary Judgment.  Unless otherwise noted, the statements made herein are of my own first-hand knowledge.

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the transcript of the Evidentiary Hearing held on June 19-21, 2007, in Playtex Products, Inc. v. Procter & Gamble, Co., SDNY Case No. 02-cv-8046 (WHP) ("*Playtex I*").

3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the Pre-Hearing Memorandum of Defendant Procter & Gamble In Support

of Its Motion to Vacate or in the Alternative to Clarify the Permanent Injunction, dated June 8, 2007, and filed in *Playtex I*.

4.      Attached hereto as Exhibit C is a true and correct copy of an e-mail from M. Anderson to C. Pollard and P. Tilton dated June 6, 2006 and marked as "Plaintiff's Exhibit 60" in the Evidentiary Hearing held on June 19-21, 2007 in *Playtex I*.

5.      Attached hereto as Exhibit D is a true and correct copy of the Complaint filed in *Playtex I*, dated October 9, 2002.

6.      Attached hereto as Exhibit E is a true and correct copy of the Jury Verdict Sheet in *Playtex I*, dated May 23, 2003.

7.      Attached hereto as Exhibit F is a true and correct copy of a letter from H. Weinberger to the Honorable Judge Pauley, dated May 3, 2007, in reference to *Playtex I*.

8.      Attached hereto as Exhibit G is a true and correct copy of a letter from H. Weinberger to the Honorable Judge Pauley, dated April 12, 2007, in reference to *Playtex I*.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of June 2008.

                                        ___ s/ Veronica C. Abreu_____
                                        Veronica C. Abreu

# EXHIBIT A

76JFPLA1                        Hearing

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PLAYTEX PRODUCTS,

 4                   Plaintiff,

 5             v.                          02 CV 8046 (WHP)

 6   PROCTER & GAMBLE,

 7                   Defendant.

 8   ------------------------------x
                                        New York, N.Y.
 9                                       June 19, 2007
                                         10:00 a.m.
10
     Before:
11
                     HON. WILLIAM H. PAULEY III,
12
                                         District Judge
13
                         APPEARANCES
14
     DAVIS POLK & WARDWELL
15        Attorneys for Plaintiff
     MATTHEW B. LEHR
16   ANTHONY I. FENWICK

17   MORRIS, NICHOLS, ARSHT & TUNNELL
          Attorneys for Plaintiff
18   MARYELLEN NOREIKA

19   KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
          Attorneys for Defendant
20   HAROLD PAUL WEINBERGER
     JONATHAN MARK WAGNER
21
     ALSO PRESENT:
22
     Paul Yestrumskes, Esq., Playtex Products
23
     Karl Steinmaris, Procter & Gamble
24   Jennifer Haber, Procter & Gamble
     Linda Cooper, Procter & Gamble
25
```

76jzpla2                    Carlin - cross

1    Q.   And you didn't do them yourself; you're not a statistician?

2    A.   That is correct.

3    Q.   Now, you would agree with me, Mr. Carlin, that simply by

4    changing the basis weight in the tampon Pledget, a tampon maker

5    can increase the absorbency in the tampon?

6    A.   Can you repeat that question?

7    Q.   Would you agree with me that by changing the basis weight

8    in a tampon Pledget, a tampon maker can increase the absorbency

9    in the tampon?

10   A.   Yes.

11   Q.   All other things being equal, a manufacturer could simply

12   add more fiber to get increased absorbency, correct?

13   A.   Yes.

14   Q.   And the downside to doing that is that you might exceed

15   limits on the syngyna test, and would you have to throw the

16   product away?

17   A.   That is a possible scenario.

18   Q.   Now, you discussed a number of changes to New Pearl with

19   Mr. Weinberger.  Other than the changes that are reflected in

20   exhibit A, defendant's exhibit A, there are no other changes,

21   correct?

22   A.   There are no other significant changes that we did for the

23   performance of the product.

24   Q.   These are the only ones that you're going to argue to Judge

25   Pauley are the ones that you made that count, right?

1    A.   Yes, sir.

2    Q.   Okay, now, your definition of a material change here is a

3    change in the basic design of the tampon.  Is that your

4    testimony?

5    A.   Yes, sir.

6    Q.   And that is the basis for your opinion that New Pearl is

7    not a materially changed version of Old Pearl, is that right?

8    A.   That's correct.  There was not a change in the basic

9    design.  Just adjustments.

10   Q.   Now, would you agree with me that the purpose of a tampon

11   is to absorb menses during a menstrual cycle?

12   A.   Yes, sir.

13   Q.   Would you agree with me that leakage protection is

14   important to consumers?

15   A.   It's a concern to the consumer, yes.

16   Q.   And a desirable goal of a tampon is to eliminate leaks,

17   correct?

18   A.   That's a desirable goal, yes, sir.

19   Q.   And one of the things that a tampon manufacturer tries to

20   do is to eliminate leaks, correct?

21   A.   That's correct.

22   Q.   And, sir, your definition of material change does not take

23   into account changes to leakage protection performance of a

24   tampon within a product configuration, does it?

25   A.   No, sir.

1  Q.  So even if whatever changes P&G made materially changed the

2  leakage protection performance of a product, that wouldn't meet

3  your definition, would it?

4  A.  No, sir.  No, that's not a material change.

5  Q.  You also testified that at least a couple of these changes

6  had no impact, in your view, on the performance of a tampon.

7  Do you recall that?

8  A.  Certainly no impact.  A very, very minuscule impact.

9  Q.  Isn't it a fact, sir, that you have no knowledge whether

10  the changes P&G made had any impact on leakage protection

11  performance?

12  A.  I hear testimony to various effects like that, but I have

13  no personal knowledge.

14  Q.  And you have no idea how P&G could have achieved

15  statistical significance over Gentle Glide with respect to

16  leakage protection without making material changes, do you?

17          MR. LEHR:  Objection, your Honor.

18          THE COURT:  Yes, sustained.

19  Q.  Now, you base your definition on 31 years of experience at

20  Playtex, am I right?

21  A.  That's essentially correct, yes, sir.  30 years plus.

22  Q.  Playtex doesn't have a set definition of what a material

23  change to a tampon is, does it?

24  A.  Not to my knowledge no.

25  Q.  And you're not aware of any book or piece of paper that

1    A.   I'm sorry, I just can't quite get my mind around that.

2    Q.   Okay, I apologize, it's probably my fault.

3         In any case, sir, your definition of material change

4    is a subjective definition, right?

5    A.   Yes, sir, I guess you could call it that.

6    Q.   That's what you call it, right?

7    A.   A subjective definition?

8    Q.   Yeah.

9    A.   Explain yourself, please.  That's my opinion, if that's

10   what you mean.

11   Q.   Can you turn to page 78 of your deposition?  Line 20.

12   Question -- do you have it there sir?

13   A.   Yes.

14   "Q. Am I right that your definition of material changes is your

15   own subjective definition?

16   "A. I have not obtained that definition from anyone else, no,

17   sir."

18   A.   That was my deposition, yes, sir.

19   Q.   Okay.  Now, would you agree with me that Playtex has made

20   claims over the years that Gentle Glide was new and improved?

21   A.   Yes, sir.

22   Q.   Okay, and you would not be surprised if Playtex on many

23   occasions had made claims that its products, or that Gentle

24   Glide was new and improved in the absence of material changes

25   as you've defined that term?

1   A.   Yes, sir.

2   Q.   In fact, Playtex is doing that today, isn't it?

3   A.   I have no idea.

4        MR. WAGNER:   Your Honor, I'm handing up Exhibit CCCC.

5   Q.   Now, sir, I'm going to --

6        THE COURT:   Actually, it's five C's.

7        MR. WAGNER:   I'm sorry.  CCCCC.

8   Q.   I'm going to represent to you, sir, that this is a

9   regulatory filing made by Playtex with respect to a new version

10  of Gentle Glide.

11       MR. LEHR:   Your Honor, may I just have a second?  My

12  team is telling me this is not on the exhibit list.  Is this on

13  the exhibit list?

14       MR. WAGNER:   No, but we had an agreement that

15  documents used for impeachment would not have to be put on the

16  list.

17       MR. LEHR:   Okay.  You're not going to offer this?

18  Okay.

19  Q.   Now, can you turn to the second page, sir, which says,

20  "Technological characteristics."  It says, "The new tampon has

21  the same technological characteristics as the clear tampon.

22  The fiber string and materials in contact with the vaginal wall

23  are the same or have the same mode of action.  The only

24  difference is in the modified tampons from the predicate

25  devices for composition of the colorants incorporated into the

1   Q.  Let's talk about a couple of the specific changes that P&G

2   made.  P&G made changes to the diameter of the pledget, did it

3   not?

4   A.  Yes, it did.

5   Q.  And it made changes to the density?

6   A.  Apparently, yes.

7   Q.  Those are just among the changes that P&G made, correct?

8   A.  That's correct.

9   Q.  Okay.  And your position is that changes to the diameter of

10  a tampon would not be a material change, right?

11  A.  Yes, sir, that was a very, very small change in diameter.

12  Q.  Okay.  And your opinion also is that changes to the density

13  of a tampon would not be a material change, correct?

14  A.  That's correct.

15  Q.  Now, if changes to the density and changes to the diameter

16  of a tampon were determined to be material changes, then your

17  opinion in this case would be incorrect, am I right?

18  A.  Say again, sir?

19  Q.  If changes to the diameter and changes to the density of a

20  tampon were determined to be material changes to a tampon, then

21  your opinion in this case would be incorrect?

22  A.  I would not be in agreement with that statement, put it

23  that way.

24  Q.  But if in fact those changes were determined by Playtex to

25  be material changes, then that would be inconsistent with your

1    Q.  Now, would you agree with me that the fact that you do a

2    test and you show that numerically the results for the two

3    products are the same, you have not demonstrated that they are

4    in fact the same, isn't that right?

5    A.  Nobody can demonstrate that fact.

6    Q.  Well, you haven't even provided evidence that they're the

7    same, just by virtue of the -- let's give you an example.  If

8    you took ten people and you tested the product with ten people,

9    and it came out that those products performed the same, would

10   you reach any conclusion from that?

11   A.  I'm not sure what the context is of what you're talking

12   about, what product test you're talking about.

13   Q.  Any product test, sir.

14   A.  Yes.

15   Q.  Isn't it correct that if you do a test and the results show

16   that both products performed the same, you can't reach any

17   conclusion from that in and of itself that the products are the

18   same?

19   A.  Well, if you do a proper analysis, you can come up with a

20   probability of whether or not they perform the same.

21   Q.  I understand.  But you have to do that, don't you?

22   A.  Sure.

23   Q.  And you have to know what the power of the test is in order

24   to do that, isn't that right?

25   A.  Yeah, you have to compute the power, sure.

1    Q.   And unless you know the power of the test, the fact that

2    the results look similar in and of itself doesn't tell you

3    anything, isn't that right?

4    A.   Unless you do a power analysis on no statistical

5    differences in results, that's true.

6    Q.   Would you look at Exhibit 16 that Mr. Lehr gave you?  These

7    are the results that you testified about from the 737, is that

8    right?

9    A.   Yes, it is.

10   Q.   And is it correct that when you add them all up

11   numerically, they're in favor of Pearl, less leaks?

12   A.   Beg your pardon?  Say that again?

13   Q.   Isn't it correct that when you add these up -- I'm just

14   looking at it -- it looks to me like they're either very

15   similar or they're numerically in favor of Pearl?

16   A.   I'm looking at the wrong one, I guess.  What does 16 look

17   like?

18   Q.   I'm sorry.  You can find the same document as Exhibit AAA

19   in the binder.  I'm not going to offer AAA, because it's the

20   same as 16.

21   A.   Would you repeat your question please, then.

22   Q.   Yes, were the results numerically in favor of Pearl when

23   you add these all up?

24   A.   It's too late to do the calculation in my head, but I

25   assume you're right.

1  Q.  In looking, it says 13 percent leak for Playtex for

2  scented, 11 percent leak for Pearl, and then on unscented

3  11 percent for each, and so on.

4  A.  Okay.

5  Q.  And in and of itself, that means nothing, isn't that

6  correct?

7  A.  That's true.

8  Q.  And isn't it a fact -- withdrawn.

9          MR. WEINBERGER:  I have no further questions.

10          MR. LEHR:  Your Honor, just two questions and I'll be

11  done.

12          THE COURT:  Go ahead, Mr. Lehr.

13          MR. LEHR:  Maybe three and we'll finish the witness.

14          THE COURT:  A lawyer's three is usually six to nine,

15  so --

16          MR. LEHR:  Judge, come on, you know me better than

17  that.  I try to stay to it.

18          THE COURT:  It's all right.

19  REDIRECT EXAMINATION

20  BY MR. LEHR:

21  Q.  Dr. Finn, Mr. Weinberger asked you about tampon loading and

22  you testified that you don't tampon load at Playtex.  Why is

23  that?

24  A.  I can't answer that directly, but it's a technical issue,

25  and my understanding from the technical folks is that it's not

761zpla2                              Phillips - direct

1    A.   The absence of a 510(k) does not indicate that a design

2    change has not occurred, and, therefore, if a design change did

3    occur, there could be an impact on leakage protection.

4    Q.   Now, could you, very briefly, give us an overview of the

5    FDA regulatory framework for devices generally in tampons,

6    specifically?

7    A.   Yes.  Very briefly, FDA regulates devices according to a

8    classification system.  There's three classes of medical

9    devices; class one, class two, class three.  Class one devices

10   have a tendency to be the lowest risk devices, the simplest

11   types of devices.  Many common bandages that you would buy

12   would be class one devices.  Tongue depressors would be class

13   one devices, which are very simple.  Class one devices receive

14   the lowest level of FDA regulation.  In fact, most class one

15   devices do not require an FDA clearance to go to market in the

16   U.S.

17        On the opposite end of the spectrum, class three

18   devices are generally those products that are life supporting,

19   life sustaining types of devices.  They may include implants.

20   Examples would be total artificial heart implantable

21   defibulator would be a class three device.  They receive the

22   highest degree of FDA regulation.  Basically, companies have to

23   provide the reasonable assurance that the individual devices

24   are safe and effective before FDA will approve class three

25   medical devices.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------x
                                                  :
PLAYTEX PRODUCTS, INC.,                           :
a Delaware corporation,                           :
                                                  :        02 Civ. 8046 (WHP)
                                                  :
                            Plaintiff,            :
                                                  :
                                                  :        FILED UNDER SEAL
             -against-                            :
                                                  :
PROCTER & GAMBLE COMPANY,                          :
an Ohio corporation,                              :
                                                  :
                            Defendant.            :
                                                  :
--------------------------------------------------x


### PRE-HEARING MEMORANDUM OF DEFENDANT
### PROCTER & GAMBLE IN SUPPORT OF ITS MOTION TO VACATE OR
### IN THE ALTERNATIVE TO CLARIFY THE PERMANENT INJUNCTION

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036

## Preliminary Statement

Defendant The Procter & Gamble Company ("P&G") respectfully submits this pre-hearing memorandum in support of its motion to vacate or in the alternative to clarify the permanent injunction entered by the Court on May 29, 2003 in favor of plaintiff Playtex Products, Inc. ("Playtex"). Among other things, the injunction bars P&G from claiming that Tampax Pearl tampons provide superior leakage protection compared to Playtex's Gentle Glide tampons, but it also provides that "Nothing in this Judgment and Order shall preclude P&G from making supported claims concerning materially changed versions of the parties' tampon products."

For more than a year, P&G has been selling an upgraded version of Tampax Pearl that in numerous important respects is materially different from the old Pearl product that was the subject of the injunction.                                    REDACTED

REDACTED

P&G also commissioned an independent testing service to conduct consumer studies comparing new Tampax Pearl to Gentle Glide for leakage protection. In the new testing, Tampax Pearl outperformed Gentle Glide with respect to leakage protection by a statistically

---

[1]     Playtex apparently plans to introduce a new version of Gentle Glide later this summer. Playtex's counsel has represented, however, that "New Gentle Glide is substantially equivalent to the Gentle Glide product that was the subject of the Court's injunction." Moreover, the product is not yet in the marketplace and P&G has not had any opportunity to analyze or test it. The introduction of new Gentle Glide is thus irrelevant to the present proceeding.

significant margin. Moreover, Playtex's own consumer testing of new Pearl, which it undertook in an attempt to rebut P&G's, actually shows the same results, even though it is marred by many flaws making it more difficult for the test to detect a performance difference between the products under actual consumer use conditions.

Given the significant changes to Tampax Pearl and the parties' test results, the Court should now exercise its authority under Fed. R. Civ. P. 60(b)(5) to lift the permanent injunction entered four years ago because it was predicated on evidence related to a materially different version of Pearl. At the very least, under the terms of the May 2003 injunction the Court should permit P&G to make its substantiated claim of superior leakage protection.

## Facts

At the hearing scheduled for June 19-21, P&G will present the facts set forth below, principally through the testimony of the following witnesses: (i) Edward Carlin, P&G Principal Engineer, (ii) Linda Cooper, P&G Director for Global Tampax and North American Feminine Care, (iii) Dr. Subhash Batra, a professor in the Department of Textile and Apparel Technology at North Carolina State University, (iv) Dr. George McCabe, Professor of Statistics and Associate Dean at Purdue University, (v) Alvin Ossip, an expert in consumer product and claims support testing, and formerly head of market research at General Foods Corporation, and (vi) on rebuttal, Phillip Phillips, former Deputy Director for Science and Regulatory Policy of the Office of Device Evaluation of the United States Food and Drug Administration ("FDA").[2]

---

[2]     P&G also reserves the right to call Mark Anderson, P&G Regulatory Affairs Manager for U.S. Feminine Care, as a rebuttal witness.

<u>Argument</u>

<u>Point 1</u>

<u>THE INJUNCTION SHOULD BE VACATED</u>

Under Rule 60(b)(5), a Court may relieve a party from an order or judgment when, among other things, "it is no longer equitable that the judgment should have prospective application." The Supreme Court has held that "it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997), quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). P&G has made numerous material changes to Tampax Pearl since the entry of the injunction, constituting a "significant change" in "factual conditions" justifying vacatur of the injunction. The jury verdict that resulted in the injunction was based on proof offered by Playtex concerning a product that is not the same as the product now marketed by P&G. It is thus no longer equitable for the injunction to operate as a restraint on P&G's truthful speech.

A.    In light of the material changes to Tampax
      <u>Pearl, the injunction should be lifted</u>

The jury verdict that occasioned the injunction was based on tests of old Pearl. P&G, however, is now marketing a materially changed version of Pearl. As Dr. Batra will testify and as P&G's testing shows, the design and manufacturing process changes to Pearl are highly significant:

REDACTED

KL3 2597344.1

*Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 598 (3d Cir. 2002) ("[B]ecause commercial speech is entitled to appropriate protection under the First Amendment, an injunction restraining allegedly false or misleading speech must be narrowly tailored to 'cover only the speech most likely to deceive consumers and harm [the plaintiff]'").

In addition, P&G is not seeking to avoid bargained-for restrictions and is therefore not subject to the heightened burden applied to parties seeking relief from provisions of a consent decree to which they voluntarily agreed. *See Rand Int'l Leisure Prods., Ltd.* 1998 WL 372356, at *1; *Kozlowski v. Coughlin*, 871 F.2d 241, 245, 248 (2d Cir. 1989). Rather, P&G is seeking relief from a court-imposed injunction, addressed to a version of Pearl no longer marketed by P&G.

It is also worthy of emphasis that P&G has complied with the injunction in good faith for four years. There is no credible allegation that P&G has ever violated the injunction, let alone a finding by the Court to that effect. *See Lewis*, 423 F. Supp. 2d 337 (holding that lengthy compliance with injunction weighed in favor of vacating injunction).

Finally, since P&G is marketing a materially changed tampon product, Playtex will suffer no prejudice if the Court grants the relief P&G seeks. In the event Playtex believes future advertising claims made by P&G are false, Playtex is free to pursue its Lanham Act remedies, as it has done in the past.

<u>Point 2</u>

ALTERNATIVELY, THE INJUNCTION SHOULD
BE CLARIFIED TO ALLOW P&G TO MAKE A
<u>CLAIM OF SUPERIOR LEAKAGE PROTECTION</u>

In the event the Court is not prepared to vacate the injunction, P&G respectfully requests that the Court clarify the injunction and hold that a claim that new Tampax Pearl

the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence").

Finally, despite methodological and analytical flaws that confounded the ability of the study to detect genuine product differences, the Playtex study actually shows that Pearl outperformed Gentle Glide for leakage protection by a statistically significant margin using at least one appropriate analysis. In all events, the Playtex test does not prove parity, as Playtex's expert acknowledged, and that is what Playtex needs to do to show that P&G's claim of superior protection is false.

Under these circumstances, the Court at the very least should rule that under paragraph 8 of the injunction P&G can make its truthful advertising claim of superior leakage protection because it is a supported claim for a materially changed version of Tampax Pearl.

<u>Conclusion</u>

For these reasons, the Court should grant P&G's motion to vacate the injunction. In the alternative, the Court should clarify that the terms of the injunction permit P&G to make its truthful advertising claim of superior leakage protection.

Dated:    New York, New York
          June 8, 2007

Kramer Levin Naftalis & Frankel LLP

By: _____
     Harold P. Weinberger (HW-3240)
     Jonathan M. Wagner (JW-7197)
     Jennifer Haber (JH-6571)
     Tobias B. Jacoby (TJ-7198)

Of Counsel:                              1177 Avenue of the Americas
Karl S. Steinmanis, Esq.                 New York, New York  10036
Andrew Eckstein, Esq.                    (212) 715-9100
The Procter & Gamble Company
One Procter & Gamble Plaza               Attorneys for Defendant
Cincinnati, Ohio  45202                  The Procter & Gamble Company

- 22 -

KL3 2597344.1

# EXHIBIT C

From:        Mark Anderson-MM-1

To:          Colin.Pollard@FDA.HHS.GOV;Paul.Tilton@FDA.HHS.GOV

BCC:         Kenneth Miller-KW-1;Linda Manning-LW

Subject:     Marketing Plans for TAMPAX Tampons

Date:        06/06/2006 14:28:21 (GMT-05:00)

To: Colin Pollard, Paul Tilton
Subject: Marketing Plans for TAMPAX  Tampons

Colin, Paul -

I wanted to let you know about Procter & Gamble's marketing plans for upgrades to two of
our Tampax tampon lines.  This is a courtesy notification, in case you become aware of
these marketing activities or receive any inquires about the products.  As these marketing
plans include confidential business information with significant competitive value, I am
requesting that you not share this information outside of FDA until the market launches
become public knowledge.

TAMPAX Pearl Tampons (Plastic Applicator)
A marketing restage of TAMPAX Pearl tampons (Light, Regular, Super and Super Plus
absorbencies; scented & unscented) is scheduled to begin in July '06.  The advertising and
label claims associated with this initiative include:
"New! Built-in Backup Braid." - This claim is based on the use of a more efficient rayon
fiber in the braided absorbent segment of the tampon withdrawal cord, adjacent to the base
of the pledget.  There is no impact on the in vitro absorbent capacity of the tampons as
measured by the syngyna test.
"New! Absorbent Core." - This claim is based on a faster expanding tampon pledget to
reduce bypass leakage.  No new materials are involved, only process changes to the way the
pledget is compressed during manufacture.  This processing change also has no impact on
the syngyna absorbency of the tampons.
"Anti-Slip Grip!" - this is not a new feature or change to the finger grip area of the
outer applicator tubes of Pearl tampons, but only reflects increased marketing emphasis on
this feature of the tampons.

We have determined that none of these changes result in a significant change to the safety
or effectiveness of the tampons compared to products described in approved 510(k)s for
TAMPAX Pearl tampons, and therefore do not require a 510(k) to be filed and approved prior
to commercial distribution of these tampons in the U.S.  Commercial shipments of Pearl
tampons incorporating these claims (and modifications) has begun in anticipation of the
start of the advertising initiative next month.

Not Relevant

Confidential




PG-000001

Not Relevant

Please let me know if you have any question, or would like to discuss either of these marketing initiatives further.

Regards,

Mark Anderson

Mark M. Anderson, Ph.D.
Product Safety & Regulatory Affairs
THE PROCTER & GAMBLE COMPANY
FemCare Global Business Unit

(513) 634-5196
(513) 634-7364 (FAX)

Confidential

PG-000002

# EXHIBIT D

ABELMAN FRAYNE & SCHWAB
Jeffrey A. Schwab (JS-9592)
Michael Aschen (MA 6336)
150 East 42nd Street
New York, New York  10017

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

02 CV    80 46

PLAYTEX PRODUCTS, INC.,
a Delaware corporation,

                          *Plaintiff*,

          -against-

PROCTER & GAMBLE COMPANY,
an Ohio corporation,

                          *Defendant*.

02 Civ.

RECEIVED
OCT - 9 2002
U.S.D.C. S.D. N.Y.
CASHIERS

COMPLAINT SEEKING INJUNCTIVE RELIEF AND DAMAGES
FOR THE USE OF FALSE OR MISLEADING DESCRIPTIONS OR
REPRESENTATIONS OF FACT IN COMMERCE (LANHAM ACT, 15
U.S.C. § 1125(a)), AND FOR COMMON LAW UNFAIR COMPETITION

        The plaintiff Playtex Products, Inc., ("Playtex"), by

its attorneys, Abelman, Frayne & Schwab, for its complaint

against defendant the Proctor & Gamble Company ("P&G"), alleges

as follows:

                    NATURE OF THE CASE

        1.    This is an action seeking injunctive relief and

damages for the use of false or misleading descriptions or

representations of fact in violation of the Trademark Act of the

United States, more particularly 15 U.S.C. § 1125(a), and for

related pendent acts of unfair competition in violation of

Playtex's common law rights.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 (Lanham Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patent, trademark and copyright), and pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

3.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

4.    Plaintiff Playtex is and was at all relevant times a corporation organized and existing under the laws of the State of Delaware, with its headquarters located at 300 Nyala Farms Road, Westport, Connecticut 06880.

5.    Playtex is a well known and famous manufacturer and distributor of, inter alia, feminine sanitary tampon products, whose tampon products are sold at thousands of retail outlets throughout the United States.

6.    Upon information and belief, the defendant P&G is and was at all relevant times a corporation organized and existing under the laws of the State of Ohio, with its headquarters at 1 P&G Plaza, Cincinnati, Ohio.

7.    Upon information and belief, P&G, a direct competitor of Playtex in the sale of tampon products, manufactures and sells its tampon products in interstate commerce and within this Southern District of New York.

2

## FACTS COMMON TO ALL CAUSES OF ACTION

8. By this action Playtex seeks to enjoin P&G, and those acting in concert with it, from making false, misleading and deceptive representations to the public concerning the physical attributes and performance characteristics of its Tampax Pearl tampons.

9. Playtex also seeks monetary damages for the injury incurred as a result of P&G's activities.

10. The two leading tampon manufacturers in the U.S. are Playtex and P&G.

11. P&G is a giant in the consumer products business with annual sales in excess of $60 billion.

12. P&G has approximately 40% dollar share of the tampon market.

13. P&G is the market leader in the cardboard applicator category, with only a marginal share (i.e., approximately 4% dollar share of sales) of the plastic applicator tampon market.

14. Playtex's annual sales are approximately $800 million.

15. Playtex has approximately 30% dollar share of total tampon market.

16. Playtex's Gentle Glide plastic applicator tampon is by far the market leader in the plastic applicator segment.

3

17.    P&G has test-marketed a tampon line incorporating plastic applicators identified by the designation "Tampax Pearl" and has recently launched the product line nationally.

**P&G's False Television Advertisements**

18.    As part of P&G's marketing for Tampax Pearl, it is airing two television commercials which, except for the voice-overs, are virtually identical.

19.    One commercial, "the Superiority TV Ad", makes the following claim concerning the Tampax Pearl:

> Introducing Tampax Pearl [t]he extraordinary new tampon
> that's superior to the plastic most of you use today.
> That's because Tampax Pearl has a smooth plastic
> applicator for more comfort.

20.    The Playtex Gentle Glide tampon is "the plastic most of you use today".

21.    The Superiority TV Ad is false, misleading and deceptive because it makes a falsely premised superiority claim over Playtex's Gentle Glide tampon, namely that the Tampax Pearl tampon is superior to the Playtex Gentle Glide tampon because it has a smooth applicator.

22.    Upon information and belief, consumers do not consider applicator characteristics to be the single most determinative factor in judging the overall superiority of a tampon product.

23.    Further, the statement literally claims an overall superiority, and upon information and belief that claim is false.

4

24. The Superiority TV Ad, makes the following additional claim:

> A totally new shape that expands width wise to fit your unique form. Even an absorbent braid for better protection.

25. This is a literal claim of superior absorbency, and it is false.

26. Further, this is a literal claim that the braid provides better protection, and it is false.

27. Another version of P&G's television advertisement, the "Revolutionary TV Ad" is also false.

28. Although not a comparative ad, it incorporates the same visual as the "Superiority TV Ad", and states as follows:

> Introducing Tampax Pearl. The revolutionary new tampon that is extraordinary in every way. With a smooth plastic applicator for incredible comfort. A totally new shape that expands width wise to fit your unique form. Even an absorbent braid for unbelievable protection.

29. Upon information and belief, the airing of both television advertisement will link the claims of one commercial with the claims in the other commercial.

30. Upon information and belief, when a consumer sees one or the other commercial, she may well merge the messages and, in effect, the false message of one will be grafted into the other.

31. Upon information and belief, the effect of the Revolutionary TV Ad is therefore false and misleading.

5

32.   The Revolutionary TV Ad is also false because the absorbent braid does not provide unbelievable protection.  The absorbency protection of the Tampax Pearl tampon and the Gentle Glide tampon are at parity.  There is nothing "unbelievable" about the protection afforded by the braid -- or indeed the Tampax Pearl tampon.

33.   P&G's airing of the aforementioned false television advertisements will irreparably injure Playtex.

**The False Claim On The Tampax Pearl Packaging**

34.   Packaging for the Tampax Pearl tampon states that the tampon has a "... [n]ew absorbent braid for leakage protection ..." (the "False Packaging Claim").

35.   The False Packaging Claim is false, misleading and deceptive because the braid does not result in the Tampax Pearl tampon providing enhanced protection.

36.   P&G's inclusion of the False Packaging Claim on its packaging thereby irreparably injures Playtex.

**P&G's False Retail Point Of Purchase Display**

37.   Also as part of its marketing efforts, P&G has provided retail merchants with an in-store, point of purchase display which states as follows:

[F]ind out why Tampax Pearl Is Better than the leading plastic.

Hereinafter the "POP Superiority Claim".

38.   The POP Superiority Claim is false, misleading and deceptive.

6

39.   P&G's distribution of the POP Superiority Claim irreparably injures Playtex.

**The False Claim on P&G's**
**Newspaper Free Standing Inserts**

32.   P&G has recently begun distributing Free Standing Inserts ("FSIs") in Westchester County newspapers that claim that its Pearl tampon "expands width-wise for the **best protection and comfort**" (emphasis in original) (the "FSI Claim").

33.   The literal and un-ambiguous meaning of this claim is that the leakage protection and wearing comfort provided by the Tampax Pearl tampon is superior to that provided by any other tampon.

34.   Upon information and belief, these claims are false.

36.   P&G's distribution of the FSI Claim irreparably injures Playtex.

40.   The aforementioned conduct constitutes utilizing false descriptions or representations in interstate and foreign commerce.

7

**AS AND FOR A FIRST CLAIM FOR INJUNCTIVE AND MONETARY
RELIEF PURSUANT TO 15 U.S.C §1125(a) FOR THE USE OF A
<u>FALSE OR MISLEADING DESCRIPTION OR REPRESENTATION OF FACT</u>**

41.   Playtex realleges paragraphs 1 through 40 as if fully set forth herein.

42.   P&G's airing of the "Superiority TV Ad" and the "Revolutionary TV Ad", distribution of the POP Superiority Claim, inclusion of the False Packaging Claim on its packaging, and distribution of the FSI Claim constitutes the sale of goods bearing, and the use of false and misleading descriptions and representations of fact in interstate commerce, and violates the Trademark Act of the United States.

43.   By reason of the foregoing the public is likely to have been, and will continue to be confused, misled or deceived, and Playtex is now and will continue to suffer irreparable injury, including injury to its good will and reputation for which it has no adequate remedy at law.

44.   Upon information and belief, P&G developed and is using the aforementioned accused representations with knowledge that they are false, misleading and deceptive, and with the intent of unfairly competing with Playtex.

45.   On account of the activities of P&G in this State, County and Southern District of New York, and in interstate commerce, Playtex has been damaged in an amount not as yet ascertained, but believed to be in excess of one million dollars ($1,000,000.00).

## AS AND FOR A SECOND CLAIM SEEKING
## INJUNCTIVE AND MONETARY RELIEF FOR UNFAIR
## COMPETITION IN VIOLATION OF THE COMMON LAW

46.   Playtex realleges paragraphs 1 through 45 as if fully set forth herein.

47   This cause of action arises under the common law.

48.   P&G's airing of the "Superiority TV Ad" and the "Revolutionary TV Ad", distribution of the POP Superiority Claim, inclusion of the False Packaging Claim on its packaging, and distribution of the FSI Claim are likely to mislead and confuse the public and injure Playtex's public image and reputation.

49.   By reason of the foregoing, P&G has engaged and is continuing to engage in acts of unfair competition in violation of the common law.

50.   Upon information and belief, P&G created, developed, disseminated, propagated and used the forgoing statements with knowledge that they were misleading and with the intent to confuse, mislead and deceive consumers, and to unfairly compete with Playtex.

51.   By reason of the foregoing, Playtex is now and will continue to suffer irreparable injury, including injury to its good will and reputation for which it has no adequate remedy at law.

9

52.   On account of the activities of P&G in this State, County and Southern District of New York, and throughout the United States, Playtex has been damaged in an amount not as yet ascertained, but believed to be in excess of one million dollars ($1,000,000.00).

**WHEREFORE**, Playtex demands judgment:

a.   preliminarily and permanently enjoining and restraining P&G, its officers, directors, principals, agents, servants, employees, successors and assigns, and all those acting in concert or participation with them, from:

(i)   manufacturing, having manufactured, producing, having produced, distributing, circulating, selling or offering for sale the Tampax Pearl tampon product in its current packaging, and from using the advertising, displays, or any other materials which include the false claims of product superiority, or the "better", "best" or "unbelievable" protection claims made in the "Superiority TV Ad", the "Revolutionary TV Ad", the PCF Superiority Claim, or the FSI Claim (as those terms are defined in the Complaint);

(ii)  making any statement or representation whatsoever, or using any false or misleading descriptions or representations of fact in connection with the manufacture, production, distribution, circulation, sale, offering for sale, advertising, promotion or display of its tampon products, including the false claims of product superiority, or the "better", "best" or "unbelievable" protection claims made in the

10

"Superiority TV Ad", the "Revolutionary TV Ad", the POP
Superiority Claim, or the FSI Claim (as those terms are defined
in the Complaint); and

        (iii) engaging in any other activity constituting
unfair competition with Playtex;

    b.   directing that P&G deliver to Playtex's attorneys
or representatives for destruction all products, labels, signs,
prints, packages, molds, plates, dies, wrappers, receptacles and
advertisements in their possession or under their control bearing
the false claims of product superiority, or the "better", "best"
or "unbelievable" protection claims made in the "Superiority TV
Ad", the "Revolutionary TV Ad", the POP Superiority Claim, or the
FSI Claim (as those terms are defined in the Complaint), and all
plates, molds, matrices and any other means of making the same;

    c.   directing that P&G file with the Court and serve
on Playtex's counsel a report in writing and under oath setting
forth in detail the manner in which they have complied with any
preliminary or permanent injunction entered herein within thirty
(30) days of receipt of service of any such order or injunction;

    d.   directing such other relief as the Court may deem
appropriate to prevent the public from being mislead or deceived;

    e.   awarding Playtex its damages caused by P&G's
manufacture, production, distribution, circulation, sale,
offering for sale, advertising, promotion or display of tampon
products employing the false claims of product superiority, or
the "better", "best" or "unbelievable" protection claims made in

11

the "Superiority TV Ad", the "Revolutionary TV Ad", the POP Superiority Claim, or the FSI Claim (as those terms are defined in the Complaint), and P&G's total profit realized thereby, and that such award be trebled pursuant to 15 U.S.C. § 1114 *et seq.*; and

     f.   directing such other and further relief as the Court may deem just and proper, together with attorney fees, interest, costs and disbursements of this action.

### DEMAND FOR JURY TRIAL

     Pursuant to Federal Rule 38(b), Playtex hereby demands a trial by jury of all issues in the foregoing matter.

Dated: October 9, 2002
     New York, New York

ABELMAN FRAYNE & SCHWAB

Jeffrey A. Schwab (JS 9592)
Michael Aschen (MA 6336)
150 East Forty Second Street
New York, New York  10017
(212) 949-9022

Counsel for Plaintiff

12

# EXHIBIT E

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLAYTEX PRODUCTS, INC.,               :
a Delaware Corporation,                              02 Civ. 8046 (WHP)

                    Plaintiff,        :        JURY VERDICT SHEET

      -against-                       :        USA 336—473
                                               (ED. 4-23-71)

PROCTER & GAMBLE COMPANY,             :        COURT
an Ohio Corporation,
                                               EXHIBIT
                    Defendant.        :        U. S. DIST. COUR'
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x     S. D. OF N. Y.

                                                  8      5/23/
WILLIAM H. PAULEY III, District Judge:                   2:20

          According to the principles of law as charged by the Court and the facts as you

find them, please answer the following questions:


I.    Playtex's Claim That Procter and Gamble Violated the Lanham Act


      1.    Has Playtex established, by a preponderance of the evidence, that Procter and
            Gamble violated the Lanham Act with regard to any of the following claims?


            a.    Superior Comfort        Yes   ✓        No_____

            b.    Superior Protection     Yes   ✓        No_____

            c.    Superior Absorbency     Yes   ✓        No_____


** If you answered "Yes" to any of the claims listed in Question 1, please proceed to Question 2.
    If you answered "No" to all of the claims listed in Question 1, please skip to Question 7.

2.   Has Procter and Gamble established, by a preponderance of the evidence, its affirmative defense that Playtex has "unclean hands"?

Yes _____    No ___✓_____

**If you responded "Yes" please skip to Question 7.
If you responded "No" please proceed to Question 3.

II.   **Playtex's Monetary Damages**

3.   Specify a dollar amount, if any, to be awarded to Playtex to compensate it for its lost profits caused by Procter and Gamble's false claims.

$ _2.96 m_____

*Please proceed to Question 4.

4.   Has Playtex established by a preponderance of the evidence that Procter and Gamble willfully engaged in the false advertising?

Yes _____    No ___✓_____

**If you answered "Yes," please proceed to Question 5.
If you answered "No," please skip Question 5 and proceed to Question 6.

5.   Specify a dollar amount, if any, to be awarded to Playtex representing Procter and Gamble's gained profits on account of its false advertising.

$ _____

*Please proceed to Question 6.

2

6. Specify a dollar amount, if any, to be awarded to Playtex to compensate it for advertising that has run, if any, to correct the effect of Procter and Gamble's false advertising.

$ _____

** Please proceed to Question 7.

III. **Procter and Gamble's Counterclaim That Playtex Violated The Lanham Act**

7. Has Procter and Gamble established, by a preponderance of the evidence, that Playtex violated the Lanham Act with regard to its "So Comfortable You Can't Even Feel Them" claim?

Yes _____        No ___✓___

**If you answered "Yes," please proceed to Question 8. If you answered "No," you have finished the verdict sheet and should not answer any further questions.

8. Has Procter and Gamble established, by a preponderance of the evidence, that Playtex's "So Comfortable You Can't Even Feel Them" claim was willfully false?

Yes _____        No _____

**Please proceed to Question 9.

3

9.    Has Playtex established, by a preponderance of the evidence, that Procter and
      Gamble has "unclean hands"?

                    Yes _____            No_____


            **Please proceed to Question 10.


10.    Has Playtex established, by a preponderance of the evidence, that Procter and
       Gamble is guilty of laches?

                    Yes _____            No_____



You have completed the verdict sheet.  Please have the foreperson sign and date
the verdict sheet, and advise the court by note that you have reached a verdict.



Dated:      May __, 2003
            New York, New York


                                        Signed:



                                        _____
                                                  FOREPERSON


                                        4

# EXHIBIT F

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

HAROLD P. WEINBERGER
PARTNER
PHONE 212-715-9132
FAX 212-715-8132
HWEINBERGER@KRAMERLEVIN.COM

May 3, 2007

The Honorable William H. Pauley, III
United States District Judge
The Daniel Patrick Moynihan United States Courthouse
   for the Southern District of New York
500 Pearl Street — Room 1660
New York, New York 10007-1312

      Re:  *Playtex Products v. Procter & Gamble Company*
            02 Civ. 8046 (WHP)

Dear Judge Pauley:

      I am writing on behalf of defendant The Procter & Gamble Company ("P&G") in connection with the pre-motion conference scheduled before Your Honor for May 11 at 2:45 p.m. In my letter requesting the conference, I indicated that P&G intended to move for clarification of the Judgment and Order of Permanent Injunction entered by this Court on May 29, 2003 (the "Injunction"). I am writing to notify Your Honor and counsel for plaintiff Playtex Products Inc. ("Playtex") that P&G will also seek permission to move to vacate the Injunction pursuant to Fed. R. Civ. P. 60(b)(5) on one of the same grounds on which the motion for clarification will be based, that is, that the Tampax Pearl product that is the subject of the Injunction has been materially changed.

      Rule 60(b)(5) permits the Court to relieve a party from a judgment where, *inter alia*, "it is no longer equitable that the judgment should have prospective application." The Supreme Court has held that "it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-84 (1992)).

      A demonstration by P&G that there has been a material change in the Tampax Pearl product since the time of the Injunction would, we submit, represent a "significant change" in "factual conditions" justifying vacatur of the Injunction. The jury verdict that resulted in the Injunction was based on proof offered by Playtex in the form of testing of a product that is no longer the same as the product being marketed. As such, it is "no longer equitable" for the Injunction

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable William H. Pauley, III
May 3, 2007
Page 2

to operate as a restraint against P&G. We believe that is particularly compelling here because insofar as it applies to the new Tampax Pearl, the Injunction operates as a restraint on commercial speech even though there has been no adjudication or even a preliminary determination that such speech is false. *See, e.g., Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 598 (3d Cir. 2002) (quoting *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990)) ("[B]ecause commercial speech is entitled to appropriate protection under the First Amendment, an injunction restraining allegedly false or misleading speech must be narrowly tailored to 'cover only the speech most likely to deceive consumers and harm [the plaintiff]'").

We look forward to addressing this issue at the conference.

Respectfully yours,

Harold P. Weinberger

HPW:bjs

cc:     Matthew Lehr, Esq.
        (Via Email PDF and Via Telecopy)

By Hand

KL3 2590862.1

# EXHIBIT G

# KRAMER LEVIN NAFTALIS & FRANKEL LLP

HAROLD P. WEINBERGER
PARTNER
PHONE 212-715-9132
FAX 212-715-8132
HWEINBERGER@KRAMERLEVIN.COM

April 12, 2007

The Honorable William H. Pauley, III
United States District Judge
United States District Court
The Daniel Patrick Moynihan United States Courthouse
    for the Southern District of New York
500 Pearl Street — Room 1660
New York, New York 10007-1312

      Re:  *Playtex Products v. Procter & Gamble Company*
            02 Civ. 8046 (WHP)

Dear Judge Pauley:

On behalf of defendant The Procter & Gamble Company ("P&G"), we respectfully write pursuant to Rule 3(A) of the Court's Individual Practices to request a pre-motion conference for an anticipated Motion for Clarification. In this motion, P&G would seek an order that the Judgment and Order of Permanent Injunction, entered by this Court on May 29, 2003 (the "Injunction") (Exh. A, attached), does not enjoin P&G from making claims of superior leakage protection for its upgraded Tampax Pearl tampon product over Playtex Products, Inc.'s ("Playtex") Gentle Glide product because, pursuant to paragraph 8 of the Injunction: (i) upgraded Pearl is "materially changed" from the product that was the subject of the injunction; and (ii) P&G's claim of superior protection for its upgraded product is supported by testing. At the pre-motion conference, P&G also will request that the Court set a date for an evidentiary hearing to determine these issues.

Playtex initially contacted the Court on October 11, 2006 to request a conference on an emergency basis concerning "shelf-talker" advertisements distributed by P&G, which stated that "Pearl® protects better than Playtex® Gentle Glide®!" and which Playtex alleged violated the Injunction. At a conference on October 16, 2006, the Court suggested that the parties conduct discovery and then file any appropriate applications for relief. Subsequently, we advised the Court that P&G had voluntarily withdrawn its shelf-talkers. By letter dated December 5, 2006, the parties jointly requested a date for an evidentiary hearing, and the Court indicated that it "will schedule a hearing date at such time as it is required." (Memorandum Endorsement dated December 20, 2006, Exh. B, attached).

1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036-2714   PHONE 212.715.9100   FAX 212.715.8000   WWW.KRAMERLEVIN.COM
ALSO AT 47 AVENUE HOCHE   75008 PARIS FRANCE
IN ALLIANCE WITH BERWIN LEIGHTON PAISNER: LONDON • BRUSSELS

KL3 2585416.1

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable William H. Pauley, III
April 12, 2007
Page 2

Since October 2006, the parties have engaged in active discovery. Documents have been exchanged and five of six fact witnesses have been deposed. All discovery is expected to be concluded by May 28. It is our hope that the Court can schedule what we believe will be at most a two-day hearing as soon after June 18 as possible. I am authorized to state that counsel for Playtex, Matthew B. Lehr of Davis Polk & Wardwell, concurs in this request for a hearing date.

A Motion for Clarification of the Injunction is appropriate under the circumstances. Where there is a "concrete situation" posing a question as to the application of an injunction, a party may petition the court for clarification of its obligations under the injunction. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) (holding clarification is in "sound discretion" of court and "apt" in the light of "a concrete situation" concerning an injunction's application); *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984) ("Clarifications of orders previously issued . . . may be obtained on motion or made sua sponte by the court . . . ."). Such motions are proper and desirable because they "add certainty to an implicated party's efforts to comply with the order and provide fair warning as to what future conduct may be found contemptuous." *N.A. Sales Co.*, 736 F.2d at 858; *see also Paramount Pictures Corp. v. Carol Publ'g Group, Inc.*, 25 F. Supp. 2d 372, 373 (S.D.N.Y. 1998) ("It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'") (quoting *Regal Knitwear Co.*, 324 U.S. at 374); *Bank of Crete v. Koskotas*, 733 F. Supp. 648, 649-50 (S.D.N.Y. 1990) ("Federal courts that issue injunctions can and should give declaratory guidance defining the meaning and scope of injunctions issued.").

Here, the "concrete situation" requiring clarification concerns paragraph 8 of the Injunction, which provides that, "Nothing in this Judgment and Order shall preclude P&G from making supported claims concerning materially changed versions of the parties' tampon products." P&G launched a new upgraded Tampax Pearl product in 2006 and now seeks to advertise that this product provides superior leakage protection over Playtex Gentle Glide. P&G's position is that such advertisements are permissible under paragraph 8 of the Injunction because the new Tampax Pearl product is materially changed and P&G's claim of superior leakage protection is supported by testing in which Tampax Pearl outperformed Playtex Gentle Glide with respect to leakage protection. Playtex's position appears to be that new Tampax Pearl is not materially changed and that P&G's testing does not support its superiority claim. Accordingly, P&G would request clarification as to whether or not advertising that the new Tampax Pearl provides superior leakage protection over Playtex Gentle Glide falls within the scope of paragraph 8 of the Injunction. It should be noted that P&G is not seeking to modify or vacate the Injunction at this time, but rather is seeking clarification as to its application to a specific set of facts.

**KRAMER LEVIN NAFTALIS & FRANKEL** LLP

The Honorable William H. Pauley, III
April 12, 2007
Page 3

       We are prepared to file a formal notice of motion some time after the pre-motion conference and prior to the hearing date.   Alternatively, if the Court is prepared to dispense with the conference, we would file the notice of motion immediately and, as soon as the Court sets a date for the hearing, propose an agreed-upon schedule for briefing.

                         Respectfully yours,

                         Harold P. Weinberger

HPW:bjs
Enclosures

cc:    Matthew B. Lehr, Esq.
       (Via PFD email and Federal Express)

By Hand

KL3 2585416.1