UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
THE PROCTER & GAMBLE COMPANY,       :   1:08-CV-01532 (WHP) (THK)
                                    :
                Plaintiff,          :   DECLARATION OF JOHN
                                    :   FINN IN SUPPORT OF
       - against -                  :   PLAYTEX PRODUCTS, INC.'S
                                    :   CONSOLIDATED
                                    :   OPPOSITION TO THE
PLAYTEX PRODUCTS, INC.,             :   PROCTER & GAMBLE
                                    :   COMPANY'S MOTION FOR
                Defendant.          :   SUMMARY JUDGMENT AND
                                    :   CROSS-MOTION FOR
                                    :   SUMMARY JUDGMENT OF
                                    :   NO *RES JUDICATA*
---------------------------------------------------------------x

I, John Patrick Finn, hereby declare:

1.   I am the Director of Global Consumer Research, Playtex Division, Energizer Personal Care. I have held this position since 2005, and have worked with consumer testing for 24 years.

2.   As Director of Global Consumer Research I supervise all consumer testing for Defendant Playtex Products, Inc. ("Playtex"). I submit this affidavit in support of Playtex's consolidated opposition to The Procter & Gamble Company ("P&G")'s motion for summary judgment and cross-motion for summary judgment in the above captioned matter.

3.   As soon as logistically feasible following the introduction of an improved version of Gentle Glide ("New Gentle Glide") to the market on May 25, 2007, Playtex began preparing to conduct an *in vivo* test comparing the leakage protection of New Gentle Glide with the version of Tampax Pearl currently on the market ("New Pearl").

4.   I supervised the testing referenced in paragraph 3.

5.   To ensure reliable results from the *in vivo* leakage protection test Playtex commissioned, the following steps were undertaken: (a) the collection of test samples from the market, (b) the development of a test protocol, (c) the fielding of the test, (d) the collection of the raw data, (e) the validation of the test data by an independent firm, and (f) the statistical analysis of the raw data.

6.   For an *in vivo* test to be reliable, the product samples tested must be representative of the products that consumers ordinarily use. A test using samples collected from the production line would not be representative. Accordingly, Playtex arranged for products to be collected from retail shelves across the nation for its *in vivo* test.

7.   While the first batches of New Gentle Glide were shipped to the market on May 25, 2007, New Gentle Glide did not penetrate the market in sufficient quantities to enable collection of a representative, nationwide sample until August 27, 2007.

8.   In addition, New Gentle Glide samples could not have been collected before they were given the opportunity to age on retail shelves. This step was necessary to ensure that the New Gentle Glide samples collected approximated the age of the New Pearl samples collected. Gathering products of a similar age is important because tampons are made of cloth rayon that is affected by temperature and humidity. As tampons are stored in their box, they can absorb moisture from the air and expand. This could potentially affect absorption and the ease of insertion. Accordingly, for an accurate comparison, it is necessary to test similarly aged products.

9.   To collect representative samples of New Gentle Glide and New Pearl products for the *in vivo* test, Playtex gathered: (a) samples of New Gentle Glide from

2

retail outlets throughout the United States; and (b) samples of New Pearl from retail outlets throughout the United States.

10. Representatives from Playtex's sales force purchased the samples referenced in paragraphs 6 and 9 from August 29 to September 27, 2007. Prior to this date, it would not have been logistically feasible to collect representative samples of both New Gentle Glide and New Pearl, as explained above. Between September 20 and October 9, the collected samples were received at Playtex's R&D Department in Dover, Delaware for repackaging.

11. It is my understanding that the hearing in *Playtex Products, Inc. v. Procter & Gamble Company*, Case No. 02-CV-0846 (WHP) occurred from June 19, 2007 to June 21, 2007. At the time of the hearing, Playtex had not yet conducted any *in vivo* testing comparing the leakage protection of New Gentle Glide to New Pearl. Nor could it have done so. As explained above, New Gentle Glide was not released onto the market in sufficient quantities to ensure collection of a representative sample until August 27, 2007, and time was required to ensure that the age of the New Gentle Glide samples collected was similar to the age of the New Pearl samples collected. In addition, in my experience, at least three (3) months are required after the samples have been repackaged and made available for consumer testing to: (a) construct a reliable protocol for *in vivo* testing; (b) recruit the volunteers who will participate in the test; (c) wait for the volunteers to undergo a menstrual cycle that is necessary for testing; (d) collect the raw data from the volunteers after they use the product during their menstrual cycles; (e) compile the raw data from the volunteer's diaries once the diaries are received by the organization conducting the test; (f) validate the data by having an independent third party attempt to

3

contact each volunteer; (g) conduct a preliminary analysis of the raw data that was validated; and (h) conduct rigorous statistical analyses of the validated data, which is necessary to interpret the results from the *in vivo* leakage protection test.

12. Playtex first commissioned Guideline, an independent research company, to conduct an *in vivo* test comparing the leakage protection of New Gentle Glide and New Pearl during the summer of 2007.

13. Guideline submitted its formal proposal to Playtex on September 25, 2007. The Guideline proposal was approved for funding only three days later, on September 28, 2007.

14. Throughout October and early November 2007, Guideline prepared and refined the protocol to be used for the *in vivo* test referenced in paragraph 12. The protocol was completed and Guideline began to place products with consumers on November 9, 2007.

15. In my experience supervising *in vivo* consumer testing over 24 years, it takes as many as 3 to 4 weeks to design and refine a protocol for *in vivo* consumer testing.

16. Guideline placed the test product with qualified female volunteers from November 9, 2007 until November 26, 2007. The test ran from November 27, 2007 until January 3, 2007.

17. The *in vivo* leakage protection test could not have been fielded for a shorter period of time. It takes, on average, at least 8 weeks to field a comparable *in vivo* test because of: (a) the fact that the female volunteers menstruate, on average, every four weeks; (b) the time required to ship the product to the female volunteers; and (c) the time

4

required to collect the data by telephone and to have the diaries returned after the study is completed.

18. Guideline began to collect the raw data from the volunteer participants on November 27, 2007. The data became available on a rolling basis as the volunteer participants returned their diaries to Guideline. The raw data was fully collected by January 3, 2007.

19. As the raw data were collected over the time period referenced in paragraph 18, Outfielders, Inc., an independent third party, conducted validation. Validation was conducted from December 20, 2007 to January 12, 2007 on a rolling basis.

20. Validation is the process whereby an independent third party is hired to call the female volunteers who participated in the study in order to verify that they did, in fact, volunteer to participate in the study, receive the product, and use the product as directed. While validation takes, on average, an additional one to three weeks after the volunteer furnishes the completed diary, it is important to ensure the reliability of the study.

21. Following validation, Guideline entered the validated data from January 14, 2008 until January 16, 2008. Guideline completed a preliminary analysis of the validated data on January 23, 2008.

22. The analysis performed by Guideline was very basic. It consisted of a simple frequency count of reported leakage for each stock keeping unit.

23. Guideline issued its final report containing its analysis on January 23, 2008. On that same day, Playtex provided the report to Professor Lynn LaMotte, a

5

statistician at Louisiana State University. Prof. LaMotte then performed sophisticated statistical tests on the data, including a mixed effect model test. This analysis was necessary to ensure that the data showing parity between New Gentle Glide and New Pearl was statistically reliable.

24. Prof. LaMotte submitted the results of his statistical analysis to Playtex on February 18, 2008. As explained in paragraph 23, Professor LaMotte's statistical analysis of the raw test data was critical to interpreting that data. Accordingly, prior to February 18, 2008, Playtex was not in possession of *in vivo* test results which demonstrated in a statistically reliable manner, that New Pearl is not, in fact, superior to New Gentle Glide with respect to leakage protection.

25. In my experience, the total amount of time that passed between the introduction of New Gentle Glide into the market and the final statistical analysis of the *in vivo* test comparing the leakage protection of New Gentle Glide and New Pearl is consistent with the average time it takes to conduct similar *in vivo* tests.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Dated: May 22, 2008

_____
John Patrick Finn, Ph.D.

6