```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/14/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                            :
PLAYTEX PRODUCTS, INC.,                     :
                                            :
                        Plaintiff,          :    08 Civ. 1532 (WHP)
                                            :
            -against-                       :    MEMORANDUM AND ORDER
                                            :
THE PROCTER & GAMBLE COMPANY,               :
                                            :
                        Defendant.          :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

    Plaintiff Playtex Products, Inc.'s ("Playtex") application for a preliminary injunction against Defendant The Procter & Gamble Company ("P&G") is the latest skirmish in the tampon advertising wars. The battles have spanned seven years and included a jury trial and several evidentiary hearings.[1] In the present dispute, Playtex alleges that P&G's advertising claims concerning the superior protection of its Tampax Pearl tampons are false, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Following several rounds of briefing, this Court held a two-day evidentiary hearing on March 18-19, 2009 (the "Preliminary Injunction Hearing"). For the reasons that follow, Playtex's motion for a preliminary injunction is denied.

---

[1] Familiarity with this Court's prior Memoranda and Orders is presumed. See Playtex Products, Inc. v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2003 WL 21242769 (S.D.N.Y. May 28, 2003); Playtex Products, Inc. v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2004 WL 1658377 (S.D.N.Y. Jul. 26, 2004); Playtex Products, Inc. v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2008 WL 399295 (S.D.N.Y. Feb. 11, 2008); Procter & Gamble Co. v. Playtex Products, Inc., No. 08 Civ. 1532 (WHP), 2008 WL 3301894 (S.D.N.Y. Aug. 7, 2008).

## FINDINGS OF FACT

### I. Background

P&G and Playtex are the two principal competitors in the plastic applicator tampon market. (Complaint dated Sept. 3, 2008 ("Compl.") ¶ 8.) P&G's Tampax Pearl has the larger market share while Playtex's Gentle Glide is the next leading brand. (Compl. ¶¶ 4, 7.) Both brands are available in regular, super, and super-plus absorbency sizes. See Playtex Products, Inc., v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2008 WL 399295, at *1 (S.D.N.Y. Feb. 11, 2008) ("Playtex I").

### II. Prior Litigation

In 2002, Playtex sued P&G (the "2002 Action"), claiming, inter alia, that P&G had violated the Lanham Act, 15 U.S.C. § 1125(a), by advertising that Tampax Pearl ("Old Pearl") provides better leakage protection and comfort than Gentle Glide ("Old Gentle Glide"). Playtex I, 2008 WL 399295, at *1. After a jury verdict in Playtex's favor, this Court entered a permanent injunction prohibiting P&G from making any claims of superior protection and comfort (the "Injunction Order"). The Injunction Order enjoined P&G from, inter alia,:

> communicating or stating that (a) Tampax Pearl tampons are superior in wearing comfort or protection to Playtex Gentle Glide tampons; and (b) Tampax Pearl tampons are superior in absorbency to or have an absorbent braid for better protection than Playtex Gentle Glide tampons, either explicitly or implicitly by reference to "the leading plastic" applicator tampon, and without limitation of reference to the use of comparative words such as "super," "better," or "more" . . . .

Playtex I, 2008 WL 399295, at *1.

Having developed a new version of Tampax Pearl ("New Pearl"), P&G moved pursuant to Fed. R. Civ. P. 60(b)(5) in June 2007 to vacate or modify the Injunction Order. Playtex I, 2008 WL 399295, at *1. After a three day evidentiary hearing, this Court modified the Injunction Order to allow P&G to claim superior protection because at that time P&G supported that claim with sufficient evidence (the "Modification Order"). Specifically, the Court "remove[d] the prohibitions against P&G advertising New Pearl's superior absorbency and protection" but "continue[d] to enjoin P&G from claiming that 'Tampax Pearl tampons . . . have an absorbent braid for better protection.'" Playtex I, 2008 WL 399295, at *5.

This Court found that, in developing New Pearl, P&G made a number of changes to its manufacturing process. First, this Court discussed P&G's changes to the braid, holding that "P&G changed the fiber used in the braids, from one with a Y-shaped cross-section to one with a round-shaped cross-section that packs more tightly and allows fluid to seep into the tampon's pad more quickly." Playtex I, 2008 WL 399295, at *2. The Court noted three additional changes: (1) "P&G modified the pads"; (2) "P&G increased the mechanical conditioning in New Pearl by compressing it with a longer push rod, resulting in shorter tampon length"; and (3) "P&G further aided the absorption and tampon expansion by increasing the diameter of the inner carrier mold used to make New Pearl." Playtex I, 2008 WL 399295, at *2. In continuing to enjoin P&G with respect to absorbency claims for its braid, the Court held that "[w]hile P&G has demonstrated that cumulative changes in its manufacturing process led to greater absorbency, it has not specifically shown that New Pearl's braid is the cause of this improvement," and cited the testimony of a P&G expert who stated that "'all of these different changes . . . collectively make the material change in the potential for improved leakage

prevention.'" Playtex I, 2008 WL 399295, at *5. Following this Court's ruling, the parties stipulated to vacate the injunction in its entirety. (Playtex's Proposed Findings of Fact and Conclusions of Law dated Apr. 8, 2009 ¶ 17; P&G's Proposed Findings of Fact and Conclusions of Law dated Apr. 8, 2009 ¶ 10.)

At the time of the June 2007 hearing, Playtex had also developed a new version of its Gentle Glide and was ready to market it ("New Gentle Glide"). See Procter & Gamble Co. v. Playtex Products, Inc., No. 08 Civ. 1532 (WHP), 2008 WL 3301894 (S.D.N.Y. Aug. 7, 2008) ("Playtex II"). However, neither party presented evidence concerning New Gentle Glide at the hearing. After the Modification Order, Playtex informed P&G that because the Modification Order was based on New Pearl's demonstrated superiority to an outdated version of Gentle Glide, any claims of superiority would be false with respect to New Gentle Glide, and thus "subject to challenge in Court." Playtex II, 2008 WL 3301894 at *1.

On February 14, 2008, P&G brought an action against Playtex seeking a declaratory judgment that the doctrine of res judicata precluded Playtex from challenging P&G's advertising claim that Tampax Pearl tampons protect better than Gentle Glide. Playtex II, 2008 WL 3301894 at *1. Both parties moved for summary judgment. By the time the motions were briefed, P&G was running advertisements in which it asserted Tampax Pearl tampons "protect even better than the next leading brand." Playtex II, 2008 WL 3301894 at *1.

On August 7, 2008, this Court denied P&G's motion and granted summary judgment to Playtex in the declaratory judgment action. Playtex II, 2008 WL 3301894 at *1. In that Memorandum & Order, this Court held that since "Playtex's current claim concerns two products—New Pearl and New Gentle Glide—that did not exist at the time Playtex brought the

[2002 Action] . . . res judicata does not preclude Playtex from raising a new claim of false advertising based on P&G's claim that New Pearl protects better than New Gentle Glide." Playtex II, 2008 WL 3301894 at *2 (internal citations omitted).

The parties were then realigned and Playtex filed its current false advertising claims. On February 18, 2009, Playtex moved for a preliminary injunction to enjoin P&G from advertising "that Tampax Pearl (a) provides superior leakage protection compared to Playtex Gentle Glide, (b) provides 'more leak-free periods' than Playtex Gentle Glide,[2] or (c) has a braid that helps stop leaks." (Docket No. 67.)

## III. The Advertisements

P&G is currently disseminating advertising that claims "Tampax Pearl stops leaks better than the next leading brand." (Joint Exs. 12-19: P&G Advertisements.) The parties do not dispute that Gentle Glide is "the next leading brand." The parties have submitted the following P&G advertisements for this Court's consideration.

### A. Print/Internet Advertisements

Two print advertisements depict a woman asleep in bed, while another woman stands over her playing a trumpet. The line above the sleeping woman's head reads, "Don't let Mother Nature interrupt your dreams." (Joint Exs. 13-14: P&G "Mother Nature" Print Advertisements.) The copy at the bottom of the advertisement concludes: "Got your Monthly

---

[2] Playtex has abandoned this aspect of its motion because P&G is not currently making this claim. (Preliminary Injunction Hearing Transcript ("Tr.") at 449-50.)

Gift? Rest easy. Tampax Pearl® with LeakGuard® stops leaks better than the next leading brand for up to 8 hours, even at night." (Joint Exs. 13-14.)

A third advertisement shows the image of a teenage girl in a soccer uniform kicking a red box wrapped in a bow; a card on the box reads, "Mother Nature's Monthly Gift." (Joint Ex. 17.) The copy at the top of the advertisement states: "When you get Mother Nature's Monthly Gift, don't back down. Tampax Pearl® has LeakGuard® built in to stop leaks better than the next leading brand. Score!" (Joint Ex. 17.) Next to the copy appears a rendering of the tampon braid, the tampon core[3] and a pad. The accompanying text reads: "LeakGuard® Braid + LeakGuard® Core = Bye Bye Backup." (Joint Ex. 17: P&G "Soccer" Print Advertisement.)

The rendering of the braid, core and pad appears in a fourth advertisement, which appears to be an Internet banner. (Joint Ex. 12: P&G "Gifted" Advertisement.) Below the rendering is text that reads, "Tampax LeakGuard® protection helps stop leaks better than the next leading brand." (Joint Ex. 12.)

B. Television Advertisements

P&G is currently running two versions of a television commercial it calls "Romance." (Joint Exs. 16-17: P&G "Romance" Television Advertisement.) Each commercial ends with the voiceover, "Tampax Pearl stops leaks better than the next leading brand . . . for up to 8 hours, even at night." (Joint Exs. 16-17.)

C. Display Advertisements

P&G also advertises on in-store display units. These display units feature graphical representations of a tampon, with the accompanying text, "with LeakGuard® braid +

---

[3] The "core" refers to the center of the tampon pledget. (Tr. at 299.)

core," alongside the claim "stops leaks better than the next leading brand." (Joint Exs. 18-19: P&G Display Advertisements.)

### D. Product Advertisements

Finally, the box containing Tampax Pearl tampons includes another graphical representation of the tampon alongside the text, "Unique LeakGuard™ Braid for leakage protection." (Joint Ex. 5: Tampax Pearl Packaging.)

## IV. In Vivo Test Comparing New Gentle Glide and New Pearl

Playtex conducted an in vivo study comparing the absorbencies of New Pearl and New Gentle Glide[4] (the "Playtex Study"). The Playtex Study compared New Pearl and New Gentle Glide in regular, super and super-plus absorbencies. (Tr. at 24.) It included 947 women aged 13 to 49 who were recruited at 27 shopping malls throughout the United States.[5] (Tr. at 24, 162; Joint Ex. 24: Playtex Study Research Proposal dated Sept. 25, 2007.) They were divided into three roughly equal groups representing the three different absorbencies. (Joint Ex. 25: at PLAY_000361: Playtex Study Table 10.)

---

[4] P&G argues that that while there is no dispute that Playtex made changes to Old Gentle Glide, these changes did not improve Old Gentle Glide's leakage protection profile. Therefore, Playtex should be collaterally estopped from arguing that New Gentle Glide provides superior leakage protection, since according to P&G, the issue of which product provides superior leakage protection was decided in Playtex I. However, since the Court denies Playtex's motion on alternative grounds, it need not reach the issue of whether New Gentle Glide represents an improvement in Old Gentle Glide's leakage protection profile. The Court refers to "New" Gentle Glide, as it has in its prior Memoranda and Orders, in order to differentiate between the two Gentle Glide products Playtex has sold and marketed over the past several years.

[5] One of the sites was eliminated in the course of the study; thus the Playtex Study consisted of 26 of the original 27 sites. (Tr. at 139.)

After qualifying to participate in the study, women were given one box of 16 unmarked tampons of the absorbency they typically use, and instructed to utilize the test tampons only when they would normally use that absorbency. (Tr. at 148-49.) If a participant needed a different absorbency from the tampons in the test box, she was instructed to use a tampon from her own supply. (Tr. at 149.) In addition, participants were told that the test tampons were numbered 1 through 16, and that they were to use them in that order. (Tr. at 78.) If the participant switched to a different absorbency and returned to the absorbency in the package, she was told to start with the lowest numbered tampon. (Tr. at 148-49; Joint Ex. 25 at PLAY_000319: Playtex Study Placement Questionnaire.)

Participants were also given a diary card and inventory sheet and asked when they expected to begin their next period. (Tr. at 151-154; Joint Ex. 25 at PLAY_000319: Playtex Study Placement Questionnaire.) After recording that date, the interviewer told participants that they would receive a phone call "[a] couple of days before [their] next period," to remind them to use the test tampons whenever they needed a tampon of that absorbency (the "Reminder Call"). (Tr. at 155.) They were also told that approximately 5 days from the date they expected to start their next period they would receive another telephone call (the "Callback Interview"), at which time they would be asked to read the answers they had written on the diary card and inventory sheet. (Joint Ex. 25 at PLAY_000319: Playtex Study Placement Questionnaire.)

The diary card asked participants to record next to each tampon number whether the tampon leaked. (Joint Ex. 25 at PLAY_000325: Playtex Study Diary Sheet.) Participants were also provided with an inventory sheet and instructed to record the tampon numbers of any unused tampons at the conclusion of their period. (Tr. at 151; Joint Ex. 25 at PLAY_000326:

Playtex Study Inventory Sheet.) During the Reminder Call, participants were again instructed "[w]hen you have used all the tampons of the absorbency you were given that were required for your period, please record on the Inventory Sheet, by circling, only the unused remaining tampon number—those tampon numbers that you did not use." (Joint Ex. 26: Playtex Study Reminder Call Script.)

The inventory sheet was intended to supplement the diary card and confirm by tampon number on the inventory sheet those tampons the participant had not used. The inventory sheet listed tampons 1-16 in two side-by-side columns with the following instruction across the top: "Please record the tampon number of any <u>unused</u> tampons remaining in the box of tampons at the end of your period." (Tr. at 152; Joint Ex. 25 at PLAY_000326: Playtex Study Inventory Sheet.) Participants were instructed to have both the diary card and the inventory sheet available during the Callback Interview. (Tr. at 152.) Participants were paid $5 to participate in the study and an additional $15 if they returned the diary sheet. (Tr. at 89.)

Playtex Study data was collected primarily through the Callback Interview, in which both the diary sheet and inventory sheet information were recorded. (Tr. at 157.)[6] Based on that data, Playtex concluded that there was no difference in leakage rates between New Gentle Glide and New Pearl. (Tr. at 164.) According to Playtex, no statistical analysis was necessary to reach that conclusion because the leakage rates were virtually identical across all absorbencies. (Tr. at 164.) The Playtex Study concluded that for the regular absorbency, 15.2% of Gentle

---

[6] Participants were not required to return their completed diary sheets, though approximately 85% did. (Tr. at 162.) The 15% of women who did not return their diary sheets reported lower leakage rates than the other 85%. (Tr. at 163.) The rate at which women returned diary sheets also varied "quite a bit" from site to site. (Tr. at 163.)

Glide and 15.4% of Tampax Pearl tampons leaked. With respect to super absorbency, 15.4% of Gentle Glide and 14.3% of Tampax Pearl tampons leaked. Finally, 14.1% of Gentle Glide and 13.9% of Tampax Pearl super-plus tampons leaked. (Joint Ex. 25 at PLAY_000293: Playtex Study Conclusions.)

The Playtex Study had several flaws. Most significantly, 51.6% of participants reported using all 16 test tampons—51% of the regular absorbency users, 48% of the super users, and 55% of the super-plus users reported using all 16 tampons. (Tr. at 70-71.) However, when these same women were asked how many tampons they used in their last period, the percentage of participants by absorbency who reported using 16 or more tampons was 26.7%, 31.9%, and 22.6%, respectively. (Joint Ex. 25 at PLAY_000371-73, PLAY_000376-77; Tr. at 555.) Moreover, while women typically use 13 to 17 tampons across all absorbencies during a period, it is unusual to use only tampons of one absorbency. (Tr. at 64-67.) Thus, the Playtex Study did not simulate normal consumer usage.

That no more than 10% of women reported using between 4 and 15 test tampons points up another anomaly in the study. (Tr. at 70-71.) The huge spike in the percentage of women using 16 tampons suggests that participants did not follow the instruction to utilize the test tampons only when they would normally use that absorbency. (Tr. at 184.) Moreover, Playtex's validation efforts, after the data was reported, did not ascertain whether participants complied with the study requirements. (Tr. at 187-88.)

Finally, because the used tampons were not collected, there is no way to cross-check the accuracy of the participants' responses. (Tr. at 87.) Indeed, "[t]here is a vast array of different consumer impressions with respect to what 'leakage' means." (Tr. at 220.) Also, there

is no way of determining whether participants actually tracked their usage or filled out their cards at the end of the survey. (Tr. at 88-89, 488.)

V. Testing of the Braid

    A. Playtex's Testing

Utilizing an apparatus that measures absorbency (the syngyna), Playtex compared Old Pearl and New Pearl with and without the braid. (Tr. at 251.) Those tests revealed that the braid does not increase absorbency. (Tr. at 252.) Playtex also performed an experiment in which it videotaped the braid's performance to determine what happens when fluid touches the top of the braid (the "Video Experiment"). (Tr. at 252-53; Joint Ex. 46: Playtex Video Experiement.) The Video Experiment does not represent in-body conditions. (Tr. at 253.)

    B. P&G's Testing

P&G performed in vitro tests for the braid, which simulates conditions inside the body, designed to measure how much fluid the tampon can "wick" or transport to the core. (Tr. at 356; Joint Ex. II at 3: P&G's In Vitro Testing of the Braid.) Based on this testing, P&G concluded that the improvements New Pearl made to the Old Pearl braid enhanced leakage protection. (Tr. at 356-57.)

## CONCLUSIONS OF LAW

I. <u>Preliminary Injunction Standard</u>

"A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, <u>and</u> (2) a likelihood of irreparable harm if the requested relief is denied." <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 152-53 (2d Cir. 2007).

A. <u>Likelihood of Success on the Merits</u>

Section 43(a) of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which–

. . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

In order to prevail on its false advertising claim under § 43(a), Playtex must demonstrate that: (1) the challenged advertisements are literally false; and (2) the false or misleading representation involved an inherent or material quality of the product. <u>Time Warner Cable</u>, 497 F.3d at 153. "Where the defendant's advertisement claims that its product is superior, plaintiff must affirmatively prove defendant's product equal or inferior." <u>Castrol, Inc. v. Quaker State Corp.</u>, 977 F.2d 57, 63 (2d Cir. 1992). In other words, it is not enough for

Playtex to show that P&G has inadequate proof of its superiority claim, but rather Playtex must adduce evidence that P&G's advertisements are false. See Procter & Gamble Co. v. Chesebrough-Pond's Inc., 747 F.2d 114, 119 (2d Cir. 1984). "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) (citation and internal quotation marks omitted).

"However, only an unambiguous message can be literally false." Time Warner Cable, 497 F.3d at 158. "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Time Warner Cable, 497 F.3d at 158. In such a case, to resolve a claim that the advertisement is literally false, "the district court must look to consumer data to determine what the person to whom the advertisement is addressed finds to be the message." Time Warner Cable, 497 F.3d at 158 (internal quotation marks and citation omitted).

### 1. P&G's Claims That Tampax Pearl Provides Superior Leakage Protection

Given the flaws in the Playtex Study, Playtex has not met its burden to prove P&G's claims of superior leakage protection are false. Specifically, the discrepancy between the percentages of women who used all 16 test tampons and the percentages of those same women who reported using 16 or more tampons in their last period raises a number of questions. While the parties dispute what impact this may have had on the reported leakage rates,[7] several conclusions are apparent. First, the Playtex Study did not simulate consumer usage. "Under the

---

[7] Most notably, the parties dispute whether participants' use of all 16 test tampons suppressed differences between the two products. The Court does not reach a conclusion on this issue.

Lanham Act, product testing can prove an advertising claim false or misleading only if those tests have some 'real world' applicability." Playtex Products, Inc. v. Procter & Gamble Co., No. 02 Civ. 8046 (WHP), 2004 WL 1658377, at *4 (S.D.N.Y. July 26, 2004) (citing S.C. Johnson & Son, Inc. v. Clorox Co., 930 F. Supp. 753, 766 (E.D.N.Y. 1996)).  Second, despite the instruction to record any unused tampons—an instruction meant to reinforce the fact that it is atypical for women to use only tampons of one absorbency during their period—more than half of the study participants recorded no unused tampons in the test box.  The participants' failure to follow directions undermines the findings of the Playtex Study.  Finally, there is no way of determining "whether the data gathered was accurately reported," Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339, 350 (S.D.N.Y. 2008), since the Playtex Study's findings were based almost exclusively on the Callback Interview.  Given participants' inability to follow instructions, their callback reports regarding leakage are suspect.  Accordingly, at this preliminary stage of the litigation, Playtex has not demonstrated a likelihood of success in proving that P&G's claim of superior leakage protection for Tampax Pearl when compared to Gentle Glide is literally false.

### 2. P&G's Claims With Respect to the Braid

"[C]ollateral estoppel applies when: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was 'a full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits.'" Ali v. Mukasey, 529 F.3d 478, 489 (2d Cir. 2008) (quoting Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir.1986)).

Both Playtex and P&G argue that the other is collaterally estopped from litigating the issue of whether Tampax Pearl's braid contributes to P&G's claims of superior absorbency when compared to Gentle Glide. Playtex argues that this Court previously decided that P&G "has not specifically shown that New Pearl's braid is the cause of [the] improvement [in Tampax Pearl's absorbency]," and therefore P&G is estopped from challenging Playtex's assertion that P&G's claims about its braid are literally false. Conversely, P&G argues that this Court previously held that while the braid is not the sole cause of Tampax Pearl's improved leakage protection, it was found to be a cause, and therefore Playtex is estopped from arguing that P&G's braid claims are literally false.

Both parties overstate the Court's conclusions in Playtex I. The issue in Playtex I was whether P&G had presented enough evidence to show a significant change in the absorbency of Tampax Pearl relative to Gentle Glide for the purposes of modifying the Injunction Order. Playtex I, 2008 WL 399295, at *5. In deciding that P&G met its burden, this Court noted that P&G had not specifically proven the braid was the cause of this improvement, but rather that P&G's manufacturing changes, including alterations to the braid, "collectively ma[de] the material change in the potential for improved leakage prevention." Playtex I, 2008 WL 399295, at *5. Indeed, in Playtex II this Court described its Playtex I holding as merely "modif[ying] the permanent injunction to allow P&G to claim superior protection because P&G could now support that claim with sufficient evidence." Playtex II, 2008 WL 3301894 at *1. The issue was not the subject of Playtex's current motion—whether Playtex can prove that the braid does not cause greater absorbency. Thus, the issues are distinct and Playtex is free to challenge the efficacy of the braid.

-15-

Playtex has not demonstrated a likelihood of success that P&G's claims about braid absorbency are literally false.[8] While Playtex's syngyna testing concluded that the braid does not increase absorbency, P&G's in vitro tests concluded that changes in the braid from Old Pearl to New Pearl help improve leakage protection. Given these conflicting results, Playtex has not carried its burden to show that P&G's braid does not contribute to "better leakage protection." See Castrol, 977 F.2d at 63. The Video Experiment does not tip the scales in Playtex's favor, because it does not simulate in-body conditions. Moreover, Playtex has not offered evidence that the changes in the braid do not make a difference in leakage protection. Accordingly, Playtex has not demonstrated a likelihood of success that P&G's claim that it has a "Unique LeakGuard™ Braid for leakage protection" is literally false.

## CONCLUSION

For the foregoing reasons, Playtex's motion for a preliminary injunction is denied.

Dated: July 14, 2009
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

---

[8] The Court notes that Playtex does not argue the alternative grounds for securing a preliminary injunction—that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.

*Counsel of record:*

Matthew Lehr, Esq.
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025
*Counsel for Plaintiff*

Harold P. Weinberger, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
*Counsel for Defendant*